COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Fitzpatrick, Judge Annunziata and
          Senior Judge Overton
Argued at Chesapeake, Virginia


DELORIS PURVIS AND PRISCILLA PURVIS,
 STATUTORY BENEFICIARIES OF
 JOHNNY STANLEY (DECEASED)                     OPINION BY
                                 CHIEF JUDGE JOHANNA L. FITZPATRICK
v.    Record No. 3241-01-1              AUGUST 27, 2002

PORTER CABS, INC. AND
 CONTINENTAL CASUALTY COMPANY


        FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Robert J. Macbeth, Jr. (Rutter, Walsh,
        Mills & Rutter, L.L.P., on briefs), for
        appellants.

        Warren H. Britt (Warren H. Britt, P.C., on
        brief), for appellee Continental Casualty
        Company.

        (Allen Lotz; Huff, Poole & Mahoney, P.C., on
        brief), for appellee Porter Cabs, Inc.
        Appellee Porter Cabs, Inc. submitting on
        brief.


     Deloris Purvis (claimant), contends the Workers'

Compensation Commission (commission) erred in finding that

Johnny Stanley (Stanley), her boyfriend of twenty-five years and

the father of her child, was not an employee of Porter Cabs,

Inc. (Porter) under Code § 65.2-101.  For the reasons that

follow, we reverse and remand for an award of compensation

consistent with this opinion.

## I. FACTS

We view the evidence in the light most favorable to the employer, who prevailed below. See Westmoreland Coal v. Russell, 31 Va. App. 16, 20, 520 S.E.2d 839, 841 (1999). The commission's factual findings are conclusive and binding on this Court when those findings are based on credible evidence. See James v. Capitol Steel Constr. Co., 8 Va. App. 512, 515, 382 S.E.2d 487, 488 (1989); Code § 65.2-706. "'What constitutes an employee is a question of law; but, whether the facts bring a person within the law's designation, is usually a question of fact.'" Intermodal Servs., Inc. v. Smith, 234 Va. 596, 600, 364 S.E.2d 221, 224 (1988) (quoting Baker v. Nussman, 152 Va. 293, 298, 147 S.E. 246, 247 (1929)). "Conclusions of the [c]omission upon questions of law, or mixed questions of law and fact, are not binding on appeal." Sinclair v. Shelter Constr. Corp., 23 Va. App. 154, 156-57, 474 S.E.2d 856, 857-58 (1996) (internal citations omitted). A person seeking benefits under the Act bears the burden of proving he or she is an "employee." Behrensen v. Whitaker, 10 Va. App. 364, 366, 392 S.E.2d 508, 509 (1990).

The evidence established that Johnny Stanley was beaten, shot and killed during a robbery while driving a taxicab for Porter on April 25, 1999. His killers admitted calling a taxicab for the sole purpose of robbing the driver. After

-

robbing Stanley of $39, they shot and killed him when he refused to get in the trunk of his cab.

At the time of the murder, Stanley was operating a taxicab owned by Neil Fairley (Fairley).  Fairley and Stanley divided evenly the cost of the gas used and the fares received when Stanley drove Fairley's cab.  Fairley's cab was dispatched through Porter.  Fairley paid Porter a weekly fee that was calculated by totaling all Porter's expenses for the week and dividing it proportionately on a per cab basis among all the cab owners.  The fee was posted as a "rent card" on Friday of each week, and the owners could not place their cabs in service again until the amount due on the "rent card" was paid to Porter.  This fee allowed Fairley's cab to carry the name Porter Cabs, Inc., use Porter's cab stand, be dispatched through Porter dispatchers and to use Porter advertising.  All cabs were painted with the Porter name and the rate schedule provided by Porter.  There were no written agreements between Porter and Fairley or Fairley and Stanley, and Porter did not pay any wages to Stanley or Fairley.

Drivers who worked in a cab affiliated with Porter were required to fill out an application for Porter and interview with Porter before beginning to drive the cabs.  If accepted by Porter, the driver had to obtain a "rate card" (a type of permit) from the permit section of the police department. Porter has monthly meetings as necessary with all the drivers.

-

Porter also provides a list of rules the drivers must follow while driving a cab affiliated with or owned by Porter.  These rules address, <u>inter</u> <u>alia</u>, length of breaks, cab maintenance, and the drivers' relationship with the dispatcher.  If drivers violate the rules, Porter can "put them in the hole," which allows the dispatcher to suspend the driver temporarily or fire him or her.  Drivers are not allowed to drive for other companies while driving for Porter.

The deputy commissioner found the accident arose out of and in the course of Stanley's work as a cab driver.  He determined Stanley to be an employee of Porter because Porter "exercised the right to control the means and methods of the work[, and] . . . some control over who was hired to drive and, significantly, could fire a driver . . . ."

The commission reversed the deputy commissioner's decision and stated:

> There is no dispute that Mr. Fairley, . . . worked as [an] independent [contractor] for Porter Cabs. Each owner, including Mr. Fairley, had a business license and paid Porter Cabs a monthly fee that allowed it to conduct business under the Porter Cabs name, and helped pay the costs associated with running the taxi stand.  The owners received no money from Porter Cabs.  The owners received their money by collecting a percentage of the fares generated by their own drivers.
>
> The issue before us is whether Mr. Stanley was an employee of Porter Cabs. We find no contract of hire between Porter Cabs and Mr. Stanley.  The evidence

establishes that when Mr. Stanley collected a fare, . . . he and Mr. Fairley would divide the fare. Porter Cabs had nothing to do with the business relationship between Mr. Stanley and Mr. Fairley. Mr. Fairley paid Porter Cabs a stand fee and other fees relating to the overhead. Thus, we find no contract of hire between Mr. Stanley and Porter Cabs.

Moreover, we find that there was insufficient control by Porter Cabs over Mr. Stanley to make Mr. Stanley an employee of Porter Cabs. There is no evidence that Porter Cabs hired, paid, or controlled Mr. Stanley. The evidence shows that while Porter Cabs specified the overall result, the company did not specify the means and methods by which Mr. Stanley drove the taxicab. The dispatchers gave the drivers instructions of the ultimate destination, and the driver decided what route to take.

Mr. Stanley had a great deal of freedom with regards to employment hours. Mr. Stanley could place the cab on the stand whenever he wanted, could drive the cab on the days and hours he desired, and could refuse fares he did not want. Porter Cabs could not compel Mr. Stanley to work. The fact that the cab displayed the Porter Cabs logo and information does not transform the driver into an employee of the cab company. Nor does the fact that Porter Cabs could put a driver "in the hole" or forbid that driver from driving for Porter Cabs. As the employer points out, Porter Cabs was simply a broker of business, a service for which it was paid a fee.

Claimant appealed that decision.[1] We hold that the commission's findings are not supported by credible evidence.

---

[1] Appellant stated she was not appealing whether Stanley was a statutory employee of Porter and, therefore, that issue is not before us.

-

II.

Claimant's sole contention on appeal is that the commission

erred in finding Stanley was not an employee of Porter pursuant

to Code § 65.2-101.[2]  She argues that the evidence established

that Stanley was an employee of Porter because Porter had the

right to control the means and methods of the work.  We agree.

The "[d]etermination of the relationship [of employee and

employer] involves a mixed question of law and fact which is

reviewable on appeal."  County of Spotsylvania v. Walker, 25 Va.

App. 224, 230, 487 S.E.2d 274, 276 (1997) (citations omitted).

> One who seeks benefits under the Workers'
> Compensation Act must show that he is an
> employee within the definition of
> Code § [65.2-101].  He bears the burden of
> proving his entitlement.  The elements of an
> employment relationship are:  (1) selection
> and engagement of the employee, (2) payment
> of wages, (3) power of dismissal, and (4)
> power of control of the employee's action.
> The most important of these is the element
> of control.

---

[2] Code § 65.2-101 defines an employee as:

> Every person, including aliens and minors,
> in the service of another under any contract
> of hire or apprenticeship, written or
> implied, whether lawfully or unlawfully
> employed, except (i) one whose employment is
> not in the usual course of the trade,
> business, occupation or profession of the
> employer or (ii) as otherwise provided in
> subdivision 2 of this definition.

Subdivision 2(d) provides an employee is not:  "Any taxicab or
executive sedan driver, provided the Commission is furnished
evidence that such individual is excluded from taxation by the
Federal Unemployment Tax Act."  We note that this provision was
not addressed and is not before us.

-

Behrensen, 10 Va. App. at 366, 392 S.E.2d at 509 (internal citations omitted).

> But . . . the first, second and third of these elements are not essential to the relationship . . . . The "power of control" is the most significant element bearing on the question. . . . In many of the cases the power of substitution or discharge, the payment of wages, and the circumstances bearing upon the relation, are dwelt upon. They, however, are not the ultimate facts, but only those more or less useful in determining whose is the work and where is the power of control.

Stover v. Ratliff, 221 Va. 509, 511-12, 272 S.E.2d 40, 42 (1980) (internal citations omitted). "Thus, [o]ne is an employee of another if the person for whom he or she works has the power to direct the means and methods by which the work is done." Mount Vernon Builders, Inc. v. Rotty, 28 Va. App. 511, 514, 507 S.E.2d 95, 97 (1998) (citing Craddock Moving & Storage Co. v. Settles, 16 Va. App. 1, 4, 427 S.E.2d 428, 430 (1993), aff'd, 247 Va. 165, 440 S.E.2d 613 (1994)). "The right of control is the determining factor in ascertaining [whether one is an employee or not]." Smith, 234 Va. at 601, 364 S.E.2d at 224.

> [T]he right of control over results does not distinguish an employee from an independent contractor; by definition of the relationship, a principal exercises certain control over results whether those results are accomplished by employee or independent contractor. The relevant and determinative distinction lies in the right to control the means and methods chosen to accomplish the result.

Walker, 25 Va. App. at 230, 487 S.E.2d at 277 (emphasis added).

-

Porter had the power to hire drivers for its own cabs as well as cabs affiliated with Porter but owned by others. Each driver had to interview with Porter. If the driver passed the interview, Porter notified the permit section of the police department that a rate card could be issued to that driver under the aegis of Porter. At hearing, Ms. Teresa Martin, a supervisor for Porter, testified as follows:

> [Ms. Martin:] You come in and you apply to be a taxicab driver. They give you a little app [sic] to fill out. Once you fill that out, if they feel like they want to have you after talking to you, what they do is tell you the things you need to get. You need to go to DMV and get a copy of your driving record. You have to go over town [sic] to see Ms. Sue Wells. She handles special permits for the police department, and then she'll give you a rate card, and then you become a taxicab driver.

> [Attorney:] When you go to get that rate card, do you have to take any paperwork from Porter's?

> [Ms. Martin:] Yes, you do. You have to take a statement saying that they are going to hire you to work as an employee.

Porter could place a driver on temporary or permanent suspension if the driver failed to comply with Porter's rules.

> [Attorney:] What else can, in your experience, drivers do, or not allowed to do [sic] that would put them in the hole?

> [Ms. Martin:] Stay out of the cab too long, don't communicate with the dispatcher and let them know what they're doing and whereabouts they're at [sic]. <u>A dispatcher must know where a driver is at all times, or then if they've been gone for so long and</u>

-

have not contacted the dispatcher, then she has to notify the police.  Then that could cause them to get put in the hole.  Things like abusive language, getting in arguments with customers, stuff like that.

[Attorney:]  How about if they get in arguments with the dispatcher?

[Ms. Martin:]  Yes.

[Attorney:]  Are there any other - - is there a standard rule book?  You said paperwork was given out at these meetings. Is there a standard rule book?

[Ms. Martin:]  Yes, we do have rules, a standard book.

[Attorney:]  Is that given out to all drivers?

[Ms. Martin:]  Yes.

[Attorney:]  And they're expected to follow those rules?

[Ms. Martin:]  Yes.

[Attorney:]  And what happens if they don't follow those rules?

[Ms. Martin:]  They would be placed in the hole.

[Attorney:]  And what is that just so that we're clear on what that means?

[Ms. Martin:]  That means the dispatcher tells you that you can no longer work for us, and you have to park the cab and go home.

[Attorney:]  And you're placed on suspension?

[Ms. Martin:]  Yes.

[Attorney:]  Can that suspension be permanent?

-

[Ms. Martin:]  Yes, it can.

[Attorney:]  And who decides whether a suspension is permanent?  In other words, who can fire a cabdriver?

[Ms. Martin:]  An owner by basically [sic] -- me, myself, and Larry Porter has the last say so in it [sic].

(Emphasis added.)

The drivers had to accept all fares unless the driver felt he or she was in danger.  A driver could not pick up a fare without Porter's permission.

[Attorney:]  When the dispatchers dispatch fare [sic], is the driver who receives that dispatch required to go out and pick up that fare?

[Ms. Martin:]  Yes.

[Attorney:]  Required by Porter Cab to do that?

[Ms. Martin:]  Yes.

    *    *    *    *    *    *    *

[Attorney:]  Does the dispatcher control where the drivers go?

[Ms. Martin:]  Oh, yes.

[Attorney:]  Can the driver pick up anybody they see on the street if they want to, or do they have to go through the dispatcher?

[Ms. Martin:]  The way that works is you have to ask permission to [sic] the dispatcher.  Once you ask the dispatcher permission, it's up to her to say yes or no. If she says no, then you cannot pick it up.

    *    *    *    *    *    *    *

-

[Attorney:] Are [the drivers] allowed to refuse a fare?

[Mr. Porter:] No. Yes. That's a two part question, yes and no. If there's a reason for safety issues, and they feel as though there may be some personal safety issues, yes, they can decline a fare. . . .

Mr. Porter testified he fired drivers for a variety of reasons and gave the following specific example:

> I pulled up to the stand one night in another car so they wouldn't know my car at approximately 10 p.m. A driver who was driving for the owner by the name of Rick Hughes, Cab 24, I had just pulled up in front of the building. They didn't know what kind of car I was in. I observed this driver with the car receive a trip. It looked like he was getting ready to pull out, and he drove no further from here to where Your Honor is and stopped right at the edge of the street. I knew it was a problem, and I'm watching this unusual behavior. I approached him. He was so sleepy and so tired that I told him that he no longer can he drive up here because I just felt, even how much money he needed, he was endangering the company and himself and other people, the citizens, so I fired him.

Clearly, Porter had the absolute authority to hire and fire Stanley.

The commission's finding that Porter did not specify the means and methods by which Stanley drove the taxicab because dispatchers only told drivers their ultimate destination and did not specify which route to take to reach the ultimate destination is without merit. The fact that the drivers often chose their specific routes shows nothing more than, due to the

-

nature of the work and as a practical matter, Porter's control did not extend to dictating each turn the driver was required to make.[3] When considered with the other indicia of control exercised by Porter, this fact is of little significance.

The evidence showed all parties agreed that Porter interviewed and determined which potential drivers received a rate card that allowed the drivers to drive; Porter had specific rules the drivers had to follow while driving for Porter; Porter could suspend a driver temporarily or fire him or her; and Porter controlled the drivers' business by directing what fares were dispatched to each driver, preventing the drivers from

---

[3] However, Mr. Porter, described a process in which the dispatcher directs the specific route an individual driver could take.

> [Attorney:] Does the dispatcher tell the owner of the vehicle or specify a specific route that the owner is to take to go pick up the fare?
>
> [Mr. Porter:] Yes, at times. And I say that varies. Most cab drivers such as Mr. Fairley and Johnny Stanley are very experienced drivers. I mean, it would hardly be necessary to tell them which route to take to get to a specific destination. However, if the dispatcher had - - a lot of times trips are what that call stat [sic]. And that's for I guess the most expedient way to dispatch cabs. In a lot of different area [sic], the trips are stacked so she may give a specific route. If she has a client who may want to be picked up at the Coliseum Mall, she'll say, why don't you pick up the interstate and pick up this fare on your way back.

picking up fares off the street without permission and not allowing drivers to refuse fares unless there were safety issues. These facts establish the requisite exercise over the "selection and engagement" of the driver, the "power to dismiss" the driver and, most importantly, the "power of control" over the driver's actions.

This analysis is consistent with the position taken by several of our sister states. In <u>Nelson v. Yellow Cab Company</u>, 538 S.E.2d 276 (S.C. Ct. App. 2000), a factually similar case, the driver was killed by a passenger and the Court of Appeals of South Carolina found the cab driver to be an employee of the cab company. Yellow Cab argued that it had a document signed by the driver stating he was not an employee. The driver kept all his fares and tips and paid for his own gas. However, the driver was required to follow Yellow Cab's dress code, use Yellow Cab's meter and fare schedule, could not accept fares not approved by Yellow Cab and could be fired by Yellow Cab. The court stated:

> The fundamental test of the employment relationship is the right of the employer to control the details of the employee's work. It is not the actual control exercised, but whether there exists the right and authority to control and direct the particular work or undertaking, as to the manner or means of its accomplishment.
>
> The test is based on the right to control, not the exercise. Most often the distinction is of importance when a skilled or experienced worker appears to be doing his or her job without supervision or interference. By an exercise test, the

_

employee would seem to be uncontrolled; yet, it will often be found that the employer, in any showdown, would have the ultimate right to dictate the method of work if there were any occasion to do so.  The right to control does not require the dictation of the thinking and manner of performing the work. It is enough if the employer has the right to direct the person by whom the services are to be performed, the time, place, degree and amount of said services.

Id. at 280 (internal citations omitted).  See also C&H Taxi Company v. Richardson, 461 S.E.2d 442 (W.Va. 1995) (C&H owned and maintained the cabs and controlled the right to terminate or not renew the lease of the cab; therefore, the drivers were employees and not independent contractors); Walls v. Allen Cab Company, Inc., 903 S.W.2d 937 (Mo. Ct. App. 1995) (Walls set his own hours, maintained and repaired his cab and collected fares, but Allen Cab Company held the governmental permit that allowed him to drive, required he follow their rules and charged him a fee to retain his permit and, therefore, he was Allen Cab Company's employee); Bowdoin v. Anchor Cab, 643 So. 2d 42 (Fla. Dist. Ct. App. 1994) (Anchor Cab controlled the maximum fares charged by the drivers and prohibited them from working for other companies and, therefore, controlled how the drivers did their work, thus, making them employees rather than independent contractors); Yellow Cab Company v. Jones, 464 N.E.2d 1079 (Ill. 1984) (Yellow Cab required the drivers to be uniform; could terminate or not renew any cab lease as well as prevent driver from subleasing a cab; repaired cabs and radios; required

-

drivers to buy gas from their garage and report mileage, thus, drivers were employees); Shinuald v. Mound City Yellow Cab Company, 666 S.E.2d 846 (Mo. Ct. App. 1984) (Yellow Cab required certain dress, cabs to fueled at Yellow Cab pumps, set rates for fares, and trained drivers, thus drivers were employees); Ziegler v. Fillmore Car Service, Inc., 442 N.Y.S.2d 276 (N.Y. App. Div. 1981) (driver was an employee and not an independent contractor because the dispatcher controlled driver's work); Golosh v. Cherokee Cab Company, 176 S.E.2d 925 (Ga. 1970) (Cherokee Cab controlled the right to fire drivers, all calls to pick up fares, and the hours worked, thus the drivers were employees).[4]

Thus, we hold the evidence establishes that Stanley was an employee of Porter because Porter had the right to control and did control the method and means of the work Stanley performed. Accordingly, we reverse and remand for an award of benefits consistent with this opinion.

Reversed and remanded.

_____

[4] Porter also argues that the method of payment requires the finding that Stanley was not an employee of Porter. Payment of wages, alone, is not the determinative factor. See Behrensen, 10 Va. App. at 366, 392 S.E.2d at 509 (the most important of these factors is the element of control). In the instant case, while Stanley was paid by his fares and the money went from Stanley to Fairley and Fairley to Porter, Stanley kept a portion of his fares as payment for his services. It is the nature of the taxicab business that the money does not travel from company owner to driver but rather from driver to company owner.

–