HALEY, Judge.
In these consolidated cases, appellants, Creative Designs Tattooing Associates, Inc. (“Creative”) and the Virginia Uninsured Employer’s Fund (“Uninsured”), maintain the Workers’ Compensation Commission erred, inter alia, in determining that Earle Lindsey Parrish, III (“Parrish”) was an employee of Creative, rather than an independent contractor. We agree, and conclude that Parrish was an independent contractor and, accordingly, his estate is not a beneficiary of the Workers’ Compensation Act.[1]
That conclusion renders moot appellants’ further claims that the commission erred in finding that Parrish’s death arose out of his employment and that Creative had three or more employees regularly in service, accordingly authorizing a fine for failure to maintain workers’ compensation insurance.

FACTS

Resolution of the dispositive issue necessitates a lengthy statement of the undisputed relevant facts.
*303 For background purposes, we note that on May 27, 2005, one or more individuals entered Creative Designs, a tattoo parlor, where Parrish and one Mike Grogan were working as tattoo artists. Grogan was tattooing an individual in one room; Parrish was in the lobby. Grogan heard a “pop” which he did not recognize as a gunshot. A man with a gun entered the room and directed Grogan and his client to the basement, where he robbed both of them. Grogan advised he could not open a safe on the premises. Grogan did not hear any conversation one or more of the men had with Parrish. After the gunman left, Grogan discovered Parrish had been shot. Parrish died soon thereafter in a local hospital.[2]
Creative is a Virginia corporation owned by Janice L. Childress who operates a tattoo parlor in a building in Richmond. The parlor has space for two “chairs.” These “chairs,” or workstations, are located in closed rooms for privacy purposes. If a tattoo artist wished to work there, he or she would contact Childress and she would review the artist’s “portfolio” of work. If Childress found the same acceptable and had an unoccupied chair, she would offer the artist an opportunity to work at the parlor. Apparently, in this field, artists shift from one parlor to another, as their circumstances, location, or desires dictate. Though Childress had the power to tell an artist a chair was “no longer available” for that artist, she had never done so prior to Parrish’s death and any change in the artists who worked at Creative evolved because one would leave and seek another opportunity and another would contact Childress.
Childress and an artist negotiated a percentage of proceeds to be received by the artist and the parlor—usually 50% each.[3] Childress testified, “At the end of the night, [the artists] calculate the tattoos that they have done during the day and would fill that out on an envelope, take their percentage, put *304 my percentage in the envelope and then deposit it in the safe.” The safe was located on the premises and was “under [Childress’] control to take [her] money out of the safe.” A combination number could open the safe, but there was no evidence that any artist had access to the same. The proceeds were almost always in cash, and the artists were free to take out their percentage upon receipt.
Childress had no written contracts with the artists. She provided no employee benefits, such as health insurance or retirement. She retained no sums for taxes, social security, or Medicare. She provided no records for the artists. She provided no W-2 or W-9 to the artists, and there is no evidence that any artist requested that she provide the same.
The artists set the hours they chose to work, that is, as the evidence showed, an earlier artist wanted to work from 11:00 a.m. to 7:00 p.m. Parrish had chosen to work from noon to 9:00 p.m. Each artist had a key to the premises, so as to accommodate his or her chosen work schedule. The artists opened and closed the doors, turned off and on an alarm system, answered any phone calls, and set up any appointments resulting from those calls as they desired.
With respect to the artists’ actual work, Childress did not mandate any number of hours of work per week, did not by herself determine when the parlor would or would not be open, did not direct how the work was to be done, did not direct what designs or colors were to be used for the tattoos, did not review the tattoo work, did not approve the artists’ tools of the trade, did not meet with or receive phone calls from prospective clients, or schedule their appointments. Childress provided neither a receptionist nor janitor for the premises. The only time Childress became involved was, if there was a customer complaint, then she and the artist would meet with the customer to try to resolve the same (since she and the artist each had a financial interest in that resolution). That resolution could include a refund.
How was the price for a tattoo determined? Childress had no input whatsoever as to pricing. She determined no mini *305 mum or maximum price. The price of a tattoo was determined solely by negotiation between the client and the artist.
What are the tools of a tattoo artist’s trade? Such an artist uses at a minimum two tattoo machines, one a liner and one a shader, though some used five or six machines for various purposes. Also used are a variety of inks, tubing for use between the inks and the machines, needles, a portfolio of available designs, Vaseline or similar ointments, bibs for the artist, gloves, and towels. Childress supplied none of these tools, and did not inspect them for adequacy. The artist brought all of the tools of the trade to the enterprise, and, as their owner, the artist was free to carry the tools away upon relocation. The only items Childress supplied were two release/ disclosure forms, one prepared by her attorney for Creative, and one mandated by the Virginia Board For Barbers and Cosmetology, to be executed prior to tattooing, and a “sharps container” for used needles. A “sharps container” is apparently a sealed hazardous waste trashcan.
Parrish and Mark Grogan were the two artists on the premises. Grogan had worked at Creative from 1995 to 2000, when he “left on his own” because “he wasn’t getting along with one of the other artists.” In 2005, he decided to return to Creative, as there was a “chair” available, and agreed to a 55% (for him)/45% proceeds division with Childress. His first day back at Creative was May 27, 2005, the day of Parrish’s death.
Consistent with Childress’ testimony, Grogan testified he “decided his schedule,” and “told them when [he] wanted to work.” He continued:
Q. [W]ho makes the decision as to how much the customer is going to be charged for a specific tattoo?
A. Ido.
Q. Okay. And is that negotiated with the customer?
A. Yes, sir.
*306 Q. Okay. And if there’s any negotiations on the charge, does the [sic] Jan Childress or Creative Design participate in that or is that between you and the customer?
A. That’s between me and the customer.
Q. [T]he process that you do to apply the tattoo, is that solely your decision or is there input from Creative Designs?
A. That’s solely mine----I do it the way I want to do it.
Grogan further testified that Creative Designs never withheld taxes or provided any benefits, like health insurance, sick leave or vacation time. Finally, he concluded: “To [his] knowledge ... all his work arrangements were the same as were Parrish’s.”

DECISION HISTORY

By opinion dated October 10, 2008, the deputy commissioner concluded Parrish was an employee. His reasoning consisted only of the following: Parrish
had acquired managerial responsibilities over time, including opening and closing the shop and dealing with the alarm system ... [, and] the shop had scheduled work hours which, though negotiable, required an artist to be present at the shop during those hours. From this evidence we find the benefits of independence and control which characterize an independent contractor did not inure to the claimant.
A majority of the commission affirmed. With respect to the paramount issue of control, the commission noted that Childress “interviewed the artists before accepting them ... [,] ... had the authority to fire a tattoo artistf, and] set the work hours for advertising purposes----”[4] The majority further noted that “the artists were paid a percentage ... [and] instructed how to split the money and deposit the money in the safe.” In addition, the majority wrote that Childress *307 provided the sharps container, required the execution of the release forms,[5] and “dealt with customer complaints.” However, as the commission further noted, “Childress testified that being a tattoo artist involved artistic skill, artistic talent, specific training and specific knowledge, none of which she herself possessed.”
Commissioner Williams dissented. He noted Childress did not exercise control over the decedent’s work. The decedent made all the decisions regarding the means and methods by which he performed his work____The decedent provided and maintained his equipment and supplies. The decedent chose his hours of work____The decedent did not work for wages or a salary. Indeed, he and he alone determined the amount he would charge his customers ... [and Childress did not provide] the decedent with any type of benefits or withhold taxes.
Finally, Commissioner Williams noted that the fact that “decedent had the authority to open and close the shop is equally indicative of his power of self-determination____”

ANALYSIS

A claimant seeking benefits under the Workers’ Compensation Act bears the burden of establishing that he is an employee as that term is defined in Code § 65.2-101. See Behrensen v. Whitaker, 10 Va.App. 364, 366, 392 S.E.2d 508, 509 (1990). An independent contractor is not an employee for Act purposes.
We view the evidence in the light most favorable to the parties prevailing before the commission. Westmoreland Coal v. Russell, 31 Va.App. 16, 20, 520 S.E.2d 839, 841 (1999). Nonetheless, “ ‘[w]hat constitutes an employee is a question of law; but, whether the facts bring a person within the law’s designation, is usually a question of fact.’ ” Intermodal Servs., Inc. v. Smith, 234 Va. 596, 600, 364 S.E.2d 221, 224 (1988) *308 (quoting Baker v. Nussman, 152 Va. 293, 298, 147 S.E. 246, 249 (1929)). The determination as to whether an individual is an employee, or an independent contractor, accordingly, “involves a mixed question of law and fact which is reviewable on appeal.” County of Spotsylvania v. Walker, 25 Va.App. 224, 230, 487 S.E.2d 274, 276 (1997). The conclusions of the commission as to mixed questions of law and fact are not binding on appellate courts. Peanut City Iron & Metal Co. v. Jenkins, 207 Va. 399, 403, 150 S.E.2d 120, 123 (1966).
“Whether the existing status is that of an employee or an independent contractor is governed, not by any express provision of the workmen’s compensation law, but by common law.” Hann v. Times-Dispatch Pub. Co., 166 Va. 102, 105, 184 S.E. 183, 184 (1936) (citing Crowder v. Haymaker, 164 Va. 77, 79, 178 S.E. 803, 804 (1935)). “No hard and fast rule can be laid down for ascertaining whether the status is one or the other. It must be determined from the facts of the particular case in the light of well settled principles.” Id. at 105-06, 184 S.E. at 184 (quoted with approval in Brown v. Fox, 189 Va. 509, 516, 54 S.E.2d 109, 113 (1949)).
In Epperson v. DeJarnette, 164 Va. 482, 486, 180 S.E. 412, 416 (1935), the Virginia Supreme Court defined an “independent contractor” as:
a person who is employed to do a piece of work without restriction as to the means to be employed, and who employs his own labor and undertakes to do the work according to his own ideas, or in accordance with plans furnished by the person for whom the work is done, to whom the owner looks only for results.
An independent contractor “ ‘prosecutes and directs the work himself, using his own methods to accomplish it.’ ” Davis Bakery v. Dozier, 139 Va. 628, 634, 124 S.E. 411, 412 (1924) (quoting Talley v. Drumheller, 135 Va. 186, 191, 115 S.E. 517, 519 (1923)). “The ordinary test is this: “Who has the power to control and direct the servants in the performance of their work?”’ Epperson, 164 Va. at 486, 180 S.E. at 414 (quoting Standard Oil Co. v. Anderson, 212 U.S. 215, 222, 29 *309 S.Ct. 252, 254, 53 L.Ed. 480 (1909)); see Virginia Emp. Comm’n v. A.I.M. Corp., 225 Va. 338, 347, 302 S.E.2d 534, 540 (1983) (‘OT the latter is free to adopt such means and methods as he chooses to accomplish the result, he is not an employee but an independent contractor.”); Ogunde v. Prison Health Servs., Inc., 274 Va. 55, 60-62, 645 S.E.2d 520, 524-25 (2007) (holding that medical services provider under contract with the Virginia Department of Corrections was an independent contractor where “the actual work to be performed ... remained] under the control of [the provider]” even though the contract set forth “staffing requirements” and restrictions on “overtime hours”).
That inquiry has expanded to include an inquiry into other factors.
In Ross v. Schneider, 181 Va. 931, 27 S.E.2d 154 (1943), the Supreme Court noted “ ‘the measure of compensation is also important for where it is based on time or piece the workman is usually a servant, and where it is based upon a lump sum for the task he is usually a contractor.’ ” Id. at 940, 27 S.E.2d at 157-58 (quoting In re Murray, 130 Me. 181, 154 A. 352, 354 (1931)); see also Glenmar Cinestate v. Farrell, 223 Va. 728, 734, 292 S.E.2d 366, 369 (1982).[6]
Whether there are deductions from compensation is, likewise, of relevance. Intermodal, 234 Va. at 602, 364 S.E.2d at 225 (“The plaintiff never was asked by the corporate defendant to complete any forms for payroll deductions. He was paid at a ‘flat rate’ for each trailer moved. No deductions *310 were made from his compensation____”); Hamilton Trucking v. Springer, 10 Va.App. 710, 716-17, 396 S.E.2d 379, 382 (1990) (“No social security was paid on his behalf ... and none was deducted from his pay; no state or federal payroll taxes were withheld____”).
Another analytical factor is “whether the employer or the workman supplies the instrumentalities [and] tools____” Uninsured Employer’s Fund v. Clark, 26 Va.App. 277, 281, 494 S.E.2d 474, 476 (1998) (“[U]sing a truck and tools provided by [the statutory employer].”); see Mims v. McCoy, 219 Va. 616, 617, 248 S.E.2d 817, 818 (1978) (“[T]hey would use their own tools____”); 3 Arthur Larson & Lex K. Larson’s Workers’ Compensation Law § 60.01(2)(e).[7]
An additional analytical factor is how hours of work are determined. See Mims, 219 Va. at 617, 248 S.E.2d at 818 (“they would choose their own work hours ... ”); Walker, 25 Va.App. at 232, 487 S.E.2d at 278 (“While the claimant was paid by the hour, she controlled the actual number of hours she worked.”). Although these additional factors have relevance, “[t]he power of control is the most significant indicium of the employment relationship; other factors merely help to elucidate the manner and degree of control.” Richmond Newspapers Inc. v. Gill, 224 Va. 92, 98, 294 S.E.2d 840, 843 (1982) (quoted with approval in Dillon Constr. v. Carter, 55 Va.App. 426, 431, 686 S.E.2d 542, 544 (2009)); see also Intermodal, 234 Va. at 601, 364 S.E.2d at 224.
*311 Accordingly, we address the above noted factors to the paramount issue of control. Parrish alone prosecuted and directed the work and used only his chosen methods to accomplish it. Parrish alone provided the instrumentalities, supplies, and tools for his work. Parrish alone reached agreement as to what tattoo or tattoos would be inscribed. Parrish alone chose his hours of work. Parrish was not paid wages or salary, had no deductions taken from his compensation, and was paid in a lump sum for his work. Finally, and of decisive import, Parrish alone set the price for his work. See 3 Larson, supra, § 61.06(2), note 30 (“A fortiori, payment in the form of a percentage of gross revenue is a strong indication of contractorship.”).
The dissent maintains that Parrish was “promoted” in that his percentage of gross receipts had risen to 55% at the time of his death. Yet Grogan, on his first day of work, was likewise receiving 55%. The dissent maintains that Parrish’s “promotion” was a recognition that he had “managerial duties,” a factor likewise noted by the commission. The only evidence touching on the subject of management (by Parrish) was the testimony of decedent’s fiancée, who simply stated, without any foundation or explanation, that “decedent was promoted to manager and increased his percentage rate.” Childress, on the other hand, explained in the context of a “change” in decedent’s “duties,” that the “other artist quit, he would be the only one there. So, obviously ... his duties ... change.” By that statement, she meant the decedent would be the only one to answer the phone, “[h]e would be the only one to help customers,” and would of necessity be required to open and close the shop. We do not consider these activities to be “managerial duties.” And we do not agree they can be dispositive of whether Parrish was an employee or an independent contractor. Likewise, footnote 1 of the dissent states: “[n]o evidence established that Parrish ... did not have the combination [to the safe].” No evidence established that he did. Indeed, the only evidence on the subject was that the safe was “[u]nder Childress’s control,” that Grogan did not have the combination, and that, as Grogan testified, “[a]ll his *312 work arrangements were the same as Parrish’s.” Thus, the only reasonable inference from the evidence was that Parrish, likewise, could not open the safe.
Finally, the dissent relies upon Purvis v. Porter Cabs, Inc., 38 Va.App. 760, 568 S.E.2d 424 (2002), in support of its position. We find that reliance substantially misplaced in light of the following quotations from Purvis: (1) “All cabs were painted with the Porter name and the rate schedule provided by Porter.'” Id. at 764, 568 S.E.2d at 426 (emphasis added); (2) “Porter also provides a list of rules the drivers must follow____These rules address, inter alia, length of breaks, cab maintenance, and the drivers’ relationship with the dispatcher.” Id. (emphasis added); (3) “‘The drivers had to accept all fares unless the driver felt he or she was in danger. A driver could not pick up a fare without Porter’s permission.’ ” Id. at 769, 568 S.E.2d at 428 (quoting from the record) (emphasis added); (4) “ ‘The way that works is you have to ask permission to (sic) the dispatcher. Once you ask the dispatcher, it is up to her to say yes or no. If she says no, then you cannot pick it up.’” Id. (quoting from the record) (emphasis added).
Childress did not provide the rate; Parrish did. Childress had no list of rules involving breaks, or even hours of Parrish’s work; Parrish chose them. Childress had no rules involving maintenance (or provision) of Parrish’s tools; Childress did not require Parrish to accept, or seek permission to decline, any individual seeking a tattoo.
The factual contrast, as to control, between Purvis and the instant case is stark, and demonstrates why the dissent’s reliance on Purvis is misplaced.

CONCLUSION

For these reasons, then, we hold Parrish was an independent contractor, not an employee of Creative Designs. Accordingly, the decision of the commission is reversed and the *313 cause remanded to the commission for implementation of our decision.

Reversed and remanded.

. Creative maintained the commission erred in assessing a fine against it for failing to maintain workers’ compensation insurance. The commission found Creative had a total of three employees, one of whom was Parrish, thereby triggering the necessity of maintaining workers’ compensation insurance. See Code § 65.2-101(2)(h). An "employee” does not include "Employees of any [employer] that has regularly in service less than three employees____” Id. Accordingly, with our conclusion Parrish was an independent contractor, not an employee, Creative had less than the threshold of three employees and was, thus, exempt from the provisions of the Workers' Compensation Act. As a result, the imposition of the fine was, likewise, error by the commission and that imposition is necessarily reversed.

. The facts surrounding Parrish's death will not be more fully developed, as they are relevant only as to whether his death arose out of his employment, an issue rendered moot, as noted above.

. At the time of his death, Parrish was receiving 55% of proceeds.

. We note that any advertising correlated to the work hours set by the artists, not by Childress.

. We further note it was the Commonwealth of Virginia that required the execution of one of the release forms.

. The " 'payment of wages’ ” is an element of an employment relationship. Mount Vernon Builders, Inc. v. Rotty, 28 Va.App. 511, 514, 507 S.E.2d 95, 96 (1998) (quoting Behrensen, 10 Va.App. at 366, 392 S.E.2d at 509); Richmond Newspapers, Inc. v. Gill, 224 Va. 92, 98, 294 S.E.2d 840, 843 (1982) (‘‘[A] person is an employee if he works for wages or a salary____"); Crowder, 164 Va. at 81, 178 S.E. at 805 ("[T]he fact that payment may be made by the piece, job, day or hour, is not necessarily controlling. It is but a fact to be considered.”); 3 Arthur Larson & Lex K. Larson’s Workers’ Compensation Law § 61.06 ("[Pjayment on a time basis is strong indication of the status of employment. Payment on a completed project basis is indicative of independent contractor status.”).

. Baker, 152 Va. at 295, 147 S.E. at 246 ("He was ... to furnish all the teams and tools....”); Craddock Moving & Storage Co. v. Settles, 16 Va.App. 1, 4, 427 S.E.2d 428, 430 (1993) ("Craddock owned the truck and supplied all of the tools Settles ... used.”), aff'd, 247 Va. 165, 440 S.E.2d 613 (1994); Metropolitan Cleaning Corp. v. Crawley, 14 Va.App. 261, 265, 416 S.E.2d 35, 38 (1992) ("She was not required to furnish her own tools or supplies.”); Brothers Construction Co. v. V.E.C., 26 Va.App. 286, 296, 494 S.E.2d 478, 483 (1998) ("While the installers provided their own tools and transportation, Brothers provided all of the materials for completion of the job. The installers were not free to choose their own materials or purchase materials from other sources.”).