ELDER, J.,
dissenting.
The majority holds that Parrish was not an employee of Creative Designs Tattooing Associates, Inc. (Creative Designs or employer), at the time of his death and, thus, his estate (claimant) is not entitled to death benefits under the Workers’ Compensation Act (the Act). I believe the evidence supports the commission’s finding that the tattoo artists working for Creative Designs—Parrish and Mark Grogan—were covered employees, making Creative Designs subject to the relevant provisions of the Act. I further agree with the commission’s finding that the assault resulting in Parrish’s death arose out of his employment with Creative Designs. I would, therefore, affirm the commission’s award of death benefits to claimant and its assessment of a civil penalty against employer for failing to maintain workers’ compensation insurance. Accordingly, I respectfully dissent.
I.
The majority addresses only one assignment of error, whereas I would address and reject all four of Creative Designs’ arguments on appeal. It is also my belief that the majority, contrary to well-settled principles, does not view the evidence in the light most favorable to the claimant, the party prevailing below. See Westmoreland Coal v. Russell, 31 Va.App. 16, 20, 520 S.E.2d 839, 841 (1999). Accordingly, I provide a recitation of the facts separate from the majority’s.
At the time of Parrish’s injury and death in 2005, Janice Childress had owned and operated the Creative Designs tattoo parlor for approximately two years, since 2003. Childress oversaw her parlor’s day-to-day operations, performing tasks such as paying bills, hiring tattoo artists, and maintaining the business’ reputation. Childress did not design or apply tattoos.
*314 Mark Grogan, one of Creative Designs’ tattoo artists, testified that on May 27, 2005, an unknown assailant robbed the tattoo parlor. As Grogan was working on a tattoo with a client, he heard a “loud pop” and saw an unidentified man walk into the room brandishing a firearm. The assailant took money from Grogan and the client and ordered them down into the basement. The assailant also demanded Grogan open the safe, but Grogan claimed he did not have access to it. Prior to the assailant’s entering the main room, Grogan had heard people talking in the lobby where Parrish was located. As Grogan entered the basement, he heard Parrish moan. Parrish later died from a gunshot wound. A certified copy of Parrish’s death record indicated Parrish was “on the job as a tattoo artist when he was shot by an assailant in an attempted robbery.”
Childress testified about her methods for staffing her business. She explained that due to the small communal nature of the tattoo industry, artists would hear of a vacancy at Creative Designs and ask to be “placed in a chair.” Childress would view the applicant’s portfolio, and “if their ability [met her] standards,” she “would offer them a space.” Childress would then negotiate what percentage of the client fee the artist would receive. The typical arrangement was that the artist and Creative Designs would each receive 50%. At the end of each night, the artist would calculate the number of tattoos he had completed during the day and write the total on an envelope, take his percentage, put Childress’ percentage in the envelop, and deposit it in a safe located in the back room of the parlor.[8]
*315 Childress required all tattoo artists at her parlor to be licensed. She also required her artists to complete liability release forms to be signed by each client. The purpose of the form was to shield Creative Designs from liability in case a client had an allergic reaction to the pigments or dyes. The form referred to the tattoo artists as “representatives and employees.”
Childress testified that she did not spend much time at Creative Designs. In the case of a complaint, she directed the client to attempt to resolve the complaint with the tattoo artist who performed the work. If the issue could not be resolved, the artist would call Childress, who would refund the client’s money in its entirety if necessary. Childress stated that for purposes of advertising, she maintained consistent hours that were affixed on the door. Lorraine Baltz, Parrish’s fiancée at the time of his death, testified Parrish “had to get clearance from Ms. Childress first” before taking time off. In her own words, Childress had to be “advised” of the change in hours. Indeed, it was Childress who dictated when the parlor opened on the day of Parrish’s death.
Because tattoo artistry requires “specific training [and] knowledge,” Childress did not maintain control over the style, quality, and time of each individual artist. Each artist also had full discretion to negotiate the price of each tattoo with the individual client. However, Childress retained the ability to terminate an artist if necessary and, contrary to the majority’s claim, had done so on one occasion.
Parrish began working at Creative Designs as an unpaid apprentice under another tattoo artist. Eventually, Parrish was deemed ready to work as a paid artist and began receiving compensation. At first, Parrish earned 35% of the fee he received from each client. At the time of his death, Parrish was keeping 55% of the fee. Parrish was also given more responsibilities, including answering the phone and opening and closing the parlor.
*316 II.
A.
PARRISH WAS A COVERED EMPLOYEE
The commission held that the evidence as a whole indicated Parrish was a covered employee and not an independent contractor. Central to the commission’s reasoning was the fact that Parrish acquired managerial duties as he continued his employment with Childress and that the percentage of his fee increased. I believe the majority both improperly fails to mention this crucial fact in its analysis and further ignores the evidence that Childress retained a significant power of control over the tattoo artists under her employ considering the specific nature of the tattoo industry.
Under the common law, the four criteria we must consider are the “ ‘(1) [selection and engagement of the servant; (2) payment of wages; (3) power of dismissal; and (4) the power of control of the servant’s action.’ ” Crowder v. Haymaker, 164 Va. 77, 79, 178 S.E. 803, 804 (1935) (quoting Baker v. Nussman, 152 Va. 293, 303, 147 S.E. 246, 249 (1929)). “The power of control is the most significant indicium of the employment relationship; other factors merely help to elucidate the manner and degree of control.” Richmond Newspapers, Inc. v. Gill, 224 Va. 92, 98, 294 S.E.2d 840, 843 (1982).
[T]he right of control includes not only the power to specify the result to be attained, but also the power to control “the means and methods by which the result is to be accomplished.” Gill, 224 Va. at 98, 294 S.E.2d at 843. An employer/employee relationship exists if the party for whom the work is to be done has the power to direct the means and methods by which the other does the work. “If the latter is free to adopt such means and methods as he chooses to accomplish the result, he is not an employee but an independent contractor.” [Va. Emp. Comm’n v.] A.I.M. Corp., 225 Va. [338,] 347, 302 S.E.2d [534,] 540 [ (1983) ]. The extent of the reserved right of control may be deter *317 mined by examining the performance of the parties in the activity under scrutiny.
Intermodal Servs., Inc. v. Smith, 234 Va. 596, 601, 364 S.E.2d 221, 224 (1988).
We look to the “potential power of control, not the actual exercise of control.” A.I.M. Corp., 225 Va. at 347, 302 S.E.2d at 539-40. Accordingly, we should “look to the nature of the work to determine on a case-by-case basis whether the employer possessed the requisite degree of control for the claimant to qualify as an employee.” Dillon Constr. v. Carter, 55 Va.App. 426, 431, 686 S.E.2d 542, 544 (2009). As is the case here, we must acknowledge that in some industries, the employer necessarily abdicates a portion of her control without bypassing the protections and benefits afforded by the Act. See Purvis v. Porter Cabs, Inc., 38 Va.App. 760, 772, 568 S.E.2d 424, 429 (2002) (noting that the “right of control” “is of importance when a skilled or experienced worker appears to be doing his or her job without supervision or interferences”). We cannot deny benefits to highly skilled and specialized employees in these industries without first examining how much potential control remains within the employer’s power.
In Purvis, we reversed the commission and remanded for an award of compensation because the evidence established that the decedent was an employee of the employer-appellee. 38 Va.App. at 773, 568 S.E.2d at 430. In that case, the decedent operated a taxicab owned by Neil Fairley, who received dispatches from Porter Cabs. No written agreement existed among the decedent, Fairley, or Porter. The evidence further proved
Porter interviewed and determined which potential drivers received a rate card that allowed the drivers to drive; Porter had specific rules the drivers had to follow while driving for Porter; Porter could suspend a driver temporarily or fire him or her; and Porter controlled the drivers’ business by directing what fares were dispatched to each driver, preventing the drivers from picking up fares off the *318 street without permission and not allowing drivers to refuse fares unless there were safety issues.
Id. at 771, 568 S.E.2d at 429. We found this evidence established “the requisite exercise over the ‘selection and engagement’ of the driver, the ‘power to dismiss’ the driver and, most importantly, the ‘power of control’ over the driver’s actions.” Id. (quoting Behrensen v. Whitaker, 10 Va.App. 364, 366, 392 S.E.2d 508, 509 (1990)).
The majority fails to take into consideration the facts similar to those found in Purvis that support the commission’s ruling that Childress possessed the potential power of control over Parrish’s work. While the evidence clearly shows Childress did not dictate how the artists were to perform their jobs in designing and applying tattoos, she still set standards for their practice and artistry. Childress required applicants to show examples of their past work so that Childress could develop a sense of the artist’s style. The artists were further subject to Childress’ control because she required them to be licensed. Childress retained the ability to oversee the quality of the artists’ work by firing them, and she had done so on one occasion. She also had the final word in resolving customer complaints in that she determined whether an artist would be required to refund a dissatisfied client’s money. Finally, Childress required her artists to fill out liability release forms. The language of the form referred to the tattoo artists as “representatives and employees,” which I find to be further evidence supporting the commission’s determination that Parrish was a covered employee. See Dillon Constr., 55 Va.App. at 433, 686 S.E.2d at 545 (recognizing that while not dispositive of the question of whether a person is a covered employee, “the parties’ intent can be considered as a factor in the ultimate determination”).
Most significantly, the majority’s analysis ignores the crucial fact that Parrish was “promoted” from an unpaid apprentice to an employee with managerial duties. Notably, it was Childress who made the business decision to promote him. When Parrish first became a full-time tattoo artist, he received only 35% of the fee paid by each client, but he soon *319 became entitled to keep 55% of the proceeds as his responsibilities within the company increased, 5% more than the typical fee for a tattoo artist. The fact Childress paid Parrish 5% more and did not hire a receptionist or janitor further evinces her reliance on Parrish to perform the regular duties of an employee to maintain the business. The majority relies on Childress’ testimony that Parrish attained these responsibilities solely by virtue of his being the only artist at the parlor and views this testimony in the light favorable to Creative Designs. This is plainly in error, as we do “not retry the facts, reweigh the preponderance of the evidence, or make [our] own determination of the credibility of the witnesses.” Wagner Enters., Inc. v. Brooks, 12 Va.App. 890, 894, 407 S.E.2d 32, 35 (1991) (emphasis added). The commission had the opportunity to hear Childress’ self-serving testimony, and it is clear the commission rejected her explanation for Parrish’s increased managerial duties. See Westmoreland Coal Co., 31 Va.App. at 20, 520 S.E.2d at 841 (“The commission’s factual findings are conclusive and binding on this Court when those findings are based on credible evidence.”).
The facts the majority views as dispositive in the resolution of this case do not include the critical element of control. While Parrish relied upon his own expertise and skill to work with a client in creating a tattoo, Childress had the ultimate say regarding the quality of the product because she hired each artist and could fire him if she found his work unsatisfactory. Indeed, Childress testified that her business reputation hinged on the quality of her artists’ work. While Parrish provided the majority of his own tools, this fact is not dispositive. See Dillon Constr., 55 Va.App. at 432, 686 S.E.2d at 545 (noting that both the claimant and the employer provided tools and materials when working at job sites). Parrish could not arbitrarily set his work hours; Childress had to be consulted first in order to maintain consistent hours for advertising purposes. Childress placed restrictions on her tattoo artists’ work by requiring them to obtain their clients’ signatures on liability release forms and creating protocols for disposing of used needles. Even though Parrish was not paid set wages, *320 the percentage of the fee he received increased based on the length of time he worked at Creative Designs and the additional managerial responsibilities he assumed. Further, while Childress did not retain sums for taxes or social security, it is not error for the commission to conclude, in light of the totality of the evidence, that this fact was not dispositive. See id. at 433, 686 S.E.2d at 545. In short, I do not believe the evidence relied upon by the majority is sufficient to warrant reversing the commission’s decision.
B.
CREATIVE DESIGNS EMPLOYED THREE OR MORE PERSONS
At the time of Parrish’s death, Childress was Creative Designs’ officer, and Parrish and Grogan also worked for the company. The commission recognized that “the work of the tattoo artists did not require constant supervision and direction by the employer.” Nonetheless, it found that Childress had “the requisite amount of control over the tattoo artists” for them to be considered employees. I believe this determination was correct.
An employer is not liable “to pay worker’s compensation under the Act” if it employs “[fewer] than three employees ‘regularly in service’ in the Commonwealth.” Mark Five Constr. v. Castle Contr., 274 Va. 283, 288, 645 S.E.2d 475, 477 (2007) (quoting Code § 65.2-101(2)(h)). The term “employee” includes “every person ... in the service of another under any contract of hire or apprenticeship, written or implied, except whose employment is not in the usual course of the trade, business, occupation or profession of the employer.” Code § 65.2-101(l)(a); see Cotman v. Green, 4 Va.App. 256, 258, 356 S.E.2d 447, 448 (1987) (holding part-time workers are included in the definition of “employee”). The employer has the burden of proving that she regularly employed fewer than three employees in Virginia. See Craddock Moving & Storage Co. v. Settles, 16 Va.App. 1, 2, 427 S.E.2d 428, 429 (1993), aff'd, 247 Va. 165, 440 S.E.2d 613 (1994).
*321 “The determination of whether an employer has met its burden of proving that it regularly employs fewer than three employees ‘is made by the Commission after exercising its role as finder of fact.’ ” Perry v. Delisle, 46 Va.App. 57, 66, 615 S.E.2d 492, 496 (2005) (quoting Bass v. City of Richmond Police Dep’t, 258 Va. 103, 114, 515 S.E.2d 557, 563 (1999)). Accordingly, we give this determination great deference on appeal if there is credible evidence in the record to support it. See id. The analysis used to determine whether an employer has three or more employees is the same as the test for determining whether the claimant is a covered employee or independent contractor. Therefore, we must consider anew those same principles to determine whether Grogan qualified as an employee or an independent contractor. See Osborne v. Forner, 36 Va.App. 91, 95, 548 S.E.2d 270, 272 (2001). Under this analytical framework, I would hold Creative Designs failed to meet its burden of proving he was not an employee.
While the record does not disclose whether Grogan shared in the same managerial responsibilities as Parrish, it is clear he shared the same arrangement in all other respects. Thus, my belief that Parrish was a covered employee of Creative applies with equal force to Grogan’s status as a covered employee. Accordingly, Creative Designs employed three persons—Parrish, Childress, and Grogan—and is therefore liable to pay workers’ compensation under the Act.
C.
PARRISH’S DEATH AROSE OUT OF HIS EMPLOYMENT
“[F]or an injury to be compensable, the claimant must show that the injury was the result of an ‘accident,’ that it ‘arose out of the employment and that it occurred ‘in the course of the employment.” Baggett Transp. Co. v. Dillon, 219 Va. 633, 636, 248 S.E.2d 819, 821 (1978). “The statutory language ‘arising out of and in the course of the employment’ should be liberally construed to carry out the humane and beneficial purposes of the Act.” Id. at 637, 248 S.E.2d at 822.
*322 “An accident arises out of the employment if there is a causal connection between the claimant’s injury and the conditions under which the employer requires the work to be performed.” R & T Investments, Ltd. v. Johns, 228 Va. 249, 252, 321 S.E.2d 287, 289 (1984). Absent contrary or conflicting evidence, “if an employee is found dead at or near his place of work from an unexplained accident, the accident will be presumed to have arisen out of and in the course of employment.” Metcalf v. A.M. Express Moving Sys., Inc., 230 Va. 464, 468, 339 S.E.2d 177, 180 (1986). Moreover, a “physical assault may constitute an ‘accident’ within the meaning of the Act when it appears that it was the result of an actual risk arising out of the employment and not personal to the employee.” Reamer v. Nat'l Serv. Indus., Inc., 237 Va. 466, 470, 377 S.E.2d 627, 629 (1989).
I would hold the commission properly applied the presumption in this case to find “the clear motive for the shooting was robbery.” On the day of the shooting, during normal business hours, Grogan heard a loud pop and then soon after heard Parrish moan. Grogan did not hear any conversation in the lobby, nor did he see anyone enter Creative Designs. In fact, Grogan was unable to give any specific details of the events immediately preceding the shooting that could contradict this presumption. In light of this lack of additional information concerning why Parrish was shot, I believe the evidence compels the conclusion that Parrish’s death arose out of and in the course of his employment.
Next, I would hold the record contains no evidence refuting the presumption. It is clear that “the only rational inference to be drawn is that [Parrish’s] death arose out of and in the course of his employment.” Baggett, 219 Va. at 642, 248 S.E.2d at 824. No evidence indicates that the assault was personal in nature. Grogan did not hear a tirade of a personal nature between Parrish and the assailant, nor did the evidence establish Parrish had any enemies. The assailant’s actions after shooting Parrish support rather than refute the presumption. The assailant entered the room where Grogan and his client sat and demanded both access to the safe and to *323 their personal money, as well. This evinces the assailant’s motive to rob the store. It is therefore reasonable to infer that the assailant made a similar demand to Parrish, who resisted and was shot. See Hopson v. Hungerford Coal Co., 187 Va. 299, 307, 46 S.E.2d 392, 396 (1948) (“[I]f the death occurred while [the employee] was attempting to protect his employer’s property from theft, his death might have been said to have arisen out of his employment.”). Thus, in this case, I would hold the evidence supports the commission’s finding that Parrish’s death arose out of and in the course of his employment.
D.
CIVIL PENALTY AGAINST CREATIVE DESIGNS
Code § 65.2-805 authorizes the commission to assess a civil penalty against an employer for failing to provide workers’ compensation insurance. See generally Va. Used Auto Parts, Inc. v. Robertson, 212 Va. 100, 181 S.E.2d 612 (1971). Because Creative Designs employed three or more persons and failed to maintain adequate insurance coverage, I would hold the commission did not err in assessing a $1,000 penalty against Creative Designs.
III.
We must recognize that “[t]he Act is to be liberally construed to effect its beneficent purpose and in borderline cases ‘employment’ should be found to exist.” A.I.M. Corp., 225 Va. at 346, 302 S.E.2d at 539 (quoting Unemp. Comp. Comm’n v. Collins, 182 Va. 426, 438, 29 S.E.2d 388, 393 (1944)). To apply too stringent a standard to an industry requiring highly skilled and specialized laborers would cause us to stray from this laudable purpose. Here, the evidence supports the finding that Childress possessed the requisite degree of control over the tattoo artists working in her parlor. For these reasons, I would hold the commission did not err in finding Parrish was a covered employee under the Act, and I would affirm its award of death benefits to claimant. Thus, I respectfully dissent.

. The evidence, viewed in the light most favorable to claimant, does not support the majority's assertion that "no artist had access to the [safe].” Grogan, who had just returned to work at Creative Designs on the day of the shooting, after working elsewhere for the previous five years, testified that he did not know the combination to the safe. Childress also testified that once the tattoo artists put money in the safe, "it was then under her control to take [her] money out of the safe.” However, no evidence established that Parrish, who had worked there for a longer period of time than Grogan and had responsibilities for opening and closing the parlor, did not have the combination.