ANNUNZIATA, Judge.
The County of Spotsylvania (County) appeals the decision of the commission awarding compensation benefits to Betty C. Walker (claimant). There is no dispute that claimant suffered a work-related injury by accident and was temporarily, totally disabled. The issue in this case is whether claimant was an “employee” within the meaning of the Act, or is otherwise excluded from coverage. We find that claimant was not an “employee” of the County and, therefore, reverse.
I.
The County’s Department of Social Services (DSS) receives allocations of federal and state funds for the purpose of purchasing various services approved by the Virginia DSS. One such service is the County’s companion services program, designed to assist low income elderly or disabled individuals with daily living skills. The County’s use of the allocated funds within the program is defined by the policies and regulations of the state DSS. Under state guidelines, funds may be used to provide only certain needs. Specifically, the companion services program is intended to address the client’s “personal needs,” not “heavy duty housework.” The state DSS establishes the maximum pay level for companion services providers, and the County determines the actual level of pay within those limits. Companion services providers are *227 paid by the County, which then obtains reimbursement from the state.
In March 1992, the County approved claimant’s application to be a companion services provider. The general terms of the relationship between the County and the service provider are contained in an “Individual Vendor Agreement.” This agreement sets forth the services the individual provider offers to render and the remuneration the County agrees to pay. The agreement is not client-specific. Specifically, it provides:
This Agreement contains the terms under which purchasing will take place, but it does not mean that Social Services will purchase any services. If Social Services wishes to purchase services it will present the Individual with a Purchase of Services Order which then becomes a part of this Agreement. The Individual shall provide services only when and as authorized by a Purchase of Services Order which has been accepted by the Individual. Social Services may terminate the Purchase of Services Order prematurely for good cause by issuing a Purchase of Services Order indicating termination.
The individual shall bill monthly on Vendor Invoice forms supplied by Social Services. The Individual shall bill Social Services and receive payment only for services authorized by a Purchase of Services Order and only for services actually provided.
* * ^ * * *
The Individual states that the services described in this Agreement are not available from the Individual without charge. Any additional fee paid by the client or the client’s family may only be with Social Services’ permission for services not specified on the Purchase of Services Order or in accordance with Social Services’ fee system as indicated on the Purchase of Services Order.
The Individual shall not subcontract or assign this Agreement to anyone else to provide any of the services under this Agreement without first obtaining written approval *228 from Social Services. The Individual is responsible for the performance of the subcontractor.
sfc * * * * *
The Individual agrees to hold Social Services harmless from any claims for damages for any actions or inactions of the Individual or his agents or employees.
The agreement further requires the provider to give the County two weeks notice if the provider is unable to provide services as agreed.
Claimant’s Individual Vendor Agreement describes the following services she offered to provide:
[pjrovide AM care (bath, dressing, ect.[sie]), prepare meals, transport to and from doctor!,] wash clothes, light house work.
Claimant was to be paid four dollars per hour and was limited to a maximum of fifteen hours per week.
County social workers administer the companion services .program. Typically, an individual seeking aid contacts a social worker, who then meets with the prospective “client” to determine that person’s need and income eligibility for the program. Once the County determines that the client qualifies, the social worker pairs the client with a particular provider. Where the client does not suggest a particular provider, the County seeks to match the client with a provider from a list of approved providers. The social worker contacts the prospective provider to discuss the needs of the new client. The prospective provider decides whether to accept the case. Providers may freely decline an offered assignment. If the provider accepts a case, the provider meets with the client, sometimes, but not necessarily, in the presence of the social worker, to discuss the details of the assignment. The client and the provider determine the specific roles of the provider and the specific times when the services will be provided. The client, not the social worker, chooses the provider.
Once the client selects a provider, the provider and the County complete a “Purchase Service Order,” detailing the *229 terms of the assignment as agreed to by the provider and the client and stating, inter alia, the services to be provided, to whom, and when. The social worker has no day-to-day supervisory responsibilities over the services provided. The social worker visits the client quarterly, unless a problem arises demanding more immediate attention. To be remunerated, the provider completes a “Vendor Invoice,” documenting, inter alia, the services provided and hours spent.
In May 1995, the County arranged for claimant to provide services to a client, Mrs. Pugh. Claimant could have declined to provide services for Mrs. Pugh, and Mrs. Pugh could have declined claimant as a provider. Mrs. Pugh was “disabled and required assistance in daily living skills”; she was bedridden with “severe dementia” and required “total care.” The record, however, contains neither a “Purchase Service Order” nor a “Vendor Invoice” describing the specific services claimant provided Mrs. Pugh. The social worker who had managed Mrs. Pugh’s case did not testify. In the course of lifting Mrs. Pugh into bed following a bath, claimant injured her back.
II.
The Workers’ Compensation Act covers employees but not independent contractors.
No definite rule has been established to ascertain whether the relationship with the principal is that of employee or independent contractor. It must be determined from the facts of the particular case in the light of well settled principles. While several tests are applied to make the determination, the final test is the right of control. The history of the Act clearly shows that the legislature did not have in mind as beneficiaries any persons other than those commonly understood as falling within a contractual relationship of employer and employee. The classification of a person as an employee or an independent contractor is governed, not by any express provision of the Act, but by common law, and we must look to it in determining who is an employee.
*230 Hamilton Trucking v. Springer, 10 Va.App. 710, 714, 396 S.E.2d 379, 381 (1990) (citations omitted). Determination of the relationship involves a mixed question of law and fact which is reviewable on appeal. Richmond Newspapers, Inc. v. Gill, 224 Va. 92, 95, 294 S.E.2d 840, 841 (1982). A person seeking benefits under the Act bears the burden of proving he or she is an “employee.” Behrensen v. Whitaker, 10 Va.App. 364, 366, 392 S.E.2d 508, 509 (1990).
The power or right of control is the most significant factor in determining the character of the relationship, and the most significant inquiry is whether the power or right to control the means and methods by which the result is to be accomplished has been reserved. Gill, 224 Va. at 98, 294 S.E.2d at 843 (finding paper carrier not employee of newspaper); Intermodal Services, Inc. v. Smith, 234 Va. 596, 601-02, 364 S.E.2d 221, 224-25 (1988); Virginia Employment Commission v. A.I.M. Corp., 225 Va. 338, 347, 302 S.E.2d 534, 539-40 (1983); Craig v. Doyle, 179 Va. 526, 531, 19 S.E.2d 675, 677 (1942).
If under the contract the party for whom the work is being done may prescribe not only what the result shall be, but also direct the means and methods by which the other shall do the work, the former is an employer, and the latter an employee. But if the former may specify the result only, and the latter may adopt such means and methods as he chooses to accomplish that result, then the latter is not an employee, but an independent contractor. So the master test is the right to control the work.
Gill, 224 Va. at 98, 294 S.E.2d at 843 (citations omitted). The right to control results is not alone sufficient to establish an employer-employee relationship. Id. Indeed, the right of control over results does not distinguish an employee from an independent contractor; by definition of the relationship, a principal exercises certain control over results whether those results are accomplished by employee or independent contractor. The relevant and determinative distinction lies in the right to control the means and methods chosen to accomplish the result.
*231 The written contract between the parties and the evidence concerning performance under that contract are factors which help “to elucidate the manner and degree of control.” Id. Indeed, the “nature of the relationship the parties intended to create is one of the factors to be considered.” Id.
In the present case, the commission concluded that the County exerted the “requisite control over the claimant’s activities” to render claimant an “employee.” The commission’s decision was premised on the following findings with respect to the Independent Vendor Agreement: (1) the agreement granted the County the right to terminate claimant’s services; (2) the agreement required claimant to give two weeks notice before ceasing to provide services; (3) the agreement established the services authorized to be provided; (4) the agreement set an hourly wage; (5) the agreement required claimant to obtain County approval before subcontracting the agreement; and (6) the parties’ use of the term “vendor” in the agreement was not relevant “since this terminology is designed clearly to establish that the [providers] are not employees and to distinguish them from other county employees.” The commission’s decision was further premised on the following findings: (1) the County “determined the types of services to be provided” in placing limitations on “heavy housework” and the number of hours to be worked per week; and (2) the County “exercised oversight and control over the provision of services.”[1] We conclude that the commission’s findings are insufficient, as a matter of law, to support a finding that claimant was an “employee” of the County. None of the commission’s findings evidences the right of control by the County over the means and methods by which claimant performed the services she contracted to provide.
*232 There is no evidence that the County directed or controlled how services were to be performed. No evidence shows that the County could direct, for example, how providers were to accomplish particular tasks, a particular order or manner of accomplishing tasks, or the tools or instruments, if any, used to accomplish a task. To the contrary, the evidence shows that the County had no day-to-day supervisory responsibility and, unless problems arose, the soeial worker visited the client only four times per year.
While claimant was paid by the hour, she controlled the actual number of hours she worked. She could freely accept or decline an offer from the County to provide services to a particular client, and the client could likewise decline to employ the provider. The maximum number of hours which .providers could work and the specific rate of remuneration were functions of the County’s fiscal constraints, not a reservation of control over the means and methods claimant could employ in providing services.
The County did not retain an absolute right to discharge claimant. Claimant could be discharged only for “good cause.” Contrary to the commission’s finding, such a limitation is “more characteristic of’ an independent contractor relationship, and while our ultimate conclusion is not premised on this factor alone, it is a factor to be considered. Gill, 224 Va. at 100, 294 S.E.2d at 844.
We also note that, contrary to the commission’s finding, the parties’ characterization of claimant’s relationship to the County as “vendor” is evidence of their intent to treat claimant as an independent contractor. While the parties’ characterization of the relationship is not conclusive of the issue, the “nature of the relationship the parties intended to create is one of the factors to be considered.” Id. at 98, 294 S.E.2d at 843.
To the extent the County had the right to control the provision of services, it could control only the parameters of the service relationship, viz., the ends to be achieved. The relationship between claimant and the County was defined *233 primarily by an agreement, the Individual Vendor Agreement, which set forth the general services claimant offered to provide and the rate at which the County agreed to compensate her. No term of that agreement authorized claimant to perform any work on behalf of the County. Rather, claimant’s work was to be authorized by subsequent agreement, which would provide the terms of service and remuneration for a specific client. Contrary to the commission’s finding, however, the County did not establish or control the services to be provided for a specific client or how the services were to be performed. Rather, the client’s needs and the provider’s ability or willingness to provide for those needs in the manner required by the specific client dictated the specific services to be provided.
The limitations the County placed on the type of services it would subsidize and the maximum number of hours per week it would compensate the provider merely set the bounds of the tripartite relationship. The County’s role in that relationship was to administer the provision of services in compliance with state DSS guidelines; it facilitated the pairing of providers with clients who met the criteria specified by the state guidelines for participation in the program, and it provided funds to subsidize services provided to its low-income citizens. The County’s role did not relate to or affect the means and methods by which the services falling within those parameters were to be provided. Cf. Gill, 224 Va. at 101, 294 S.E.2d at 845 (placing no significance in fact that newspaper had right to control route carrier was required to follow: “The geographical description of the ‘area of primary responsibility’ was merely a definition of the job territory ... not a limitation upon the manner in which Gill served his customers.”).
The requirements that claimant give two weeks notice before ceasing to provide services and obtain County approval before subcontracting the agreement relate, if at all, to the County’s right to control the result sought to be accomplished, the provision of services, rather than the methods and means of their provision. Indeed, the provision in the agreement regarding subcontracting services further provides that once *234 services are subcontracted, the provider is responsible for the performance of the subcontractor. In any event, even considering those factors as indicative of an employer-employee relationship, they alone are not conclusive.
In sum, there is no evidence to support a finding that the County had the right to control the means and methods by which claimant provided services. The County’s right to control extended only to the parameters of the tripartite relationship and was, at most, oriented to effecting, generally, the provision of services to its low-income citizens. Contrary to the dissent’s position, we decline to infer a right to control means and methods from a right to control results. Such an inference would collapse the common law distinction between employees and independent contractors.
Accordingly, the commission’s decision must be reversed.[2]

Reversed.

. The commission further found that claimant was not exempt from the Act as a "domestic servant.” See Code § 65.2 — 101(2)(f).

. The Comity also contends that claimant is precluded from compensation under Code § 65.2-101(2)®, which excludes "domestic servants.” Finding that the commission's decision must be reversed on other grounds, we need not address this issue. We note, however, that the relevant inquiry under Code § 65.2-101(2)® is the employment relationship between the alleged "domestic servant” and the party for whom that person provides domestic service. The cases the County cites bear this out. Here, however, the issue is the employment relationship between claimant and the County; claimant does not suggest Mrs. Pugh was her employer. Accordingly, the body of law which excludes domestic servants from the protections of workers’ compensation legislation is inapposite to this case.