COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Fitzpatrick, Judges Frank and Clements


CHUCK BENNETT & SONS HEATING
 AND AIR CONDITIONING AND
 SOUTHERN INSURANCE COMPANY

                                                    MEMORANDUM OPINION[*]
v.        Record No. 2203-03-2                          PER CURIAM
                                                    DECEMBER 30, 2003
WALTER MONCURE COTTRELL


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            (Andrew R. Blair; Blair Law Offices, on brief), for appellants.

            (Louis D. Snesil; Louis D. Snesil, P.C., on brief), for appellee.


        Chuck Bennett & Sons Heating and Air Conditioning and its insurer (hereinafter referred

to as "Bennett & Sons") contend the Workers' Compensation Commission erred in finding that

Walter Moncure Cottrell (claimant) proved he was an employee of Bennett & Sons at the time of

his compensable left eye injury on December 6, 2001.  Upon reviewing the record and the

parties' briefs, we conclude that this appeal is without merit.  Accordingly, we summarily affirm

the commission's decision.  Rule 5A:27.

        Claimant, an experienced sheet metal mechanic, testified that in the Fall of 2001, Michael

Cain, a part-owner of Bennett & Sons, offered claimant work, five days per week, at ten dollars

per hour for the first week, and after that, he "moved [claimant] to eleven."  Claimant quit his

carpentry/roofing job with Elton Adams to accept Cain's offer.  Thereafter, each morning,

Monday through Friday, claimant met with approximately six other workers at Cain's home, his

place of business, at approximately 7:30 a.m.  At that time, Cain assigned each worker to a

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

jobsite. Claimant worked on residential and commercial jobsites as part of a crew. Claimant did not know who was going to be on his crew on any given day. Claimant did not engage in other employment during the time he worked for Bennett & Sons on an hourly basis. A time card reflecting the hours claimant worked during the week ending December 5, 2001 was introduced into evidence. Claimant denied that he personally employed anyone to help him while he worked for Bennett & Sons or that he ever subcontracted any assignment while working for Bennett & Sons. Claimant stated that either Cain or Charles Bennett, Jr. (known as Chuck, Jr.) worked alongside him at the jobsite and that one of them was in charge of the work.

On the morning of December 6, 2001, claimant and the other workers arrived at Cain's residence as usual. Cain assigned claimant, Chuck Jr., and Robert Collins to a particular jobsite to replace an oil furnace with a hot air furnace. Claimant was not involved in procuring that job. While performing that job, claimant injured his left eye.

Claimant admitted that he knew Bennett & Sons did not withhold taxes from his paycheck, but he "figured I'd better keep quiet." Claimant testified that his nephew, Michael Dennis, worked for Bennett & Sons before claimant's regular hourly employment with Bennett & Sons. Claimant denied ever hiring Dennis to perform work for Bennett & Sons. Claimant testified that Bennett & Sons paid Dennis by the job.

Claimant admitted that two to three months before he started regular hourly work for Bennett & Sons, he performed two or three jobs for them at the rate of approximately $100 per day. Dennis also did some work for Bennett & Sons during that time and was paid by the day. Claimant testified that when Cain asked him to work for Bennett & Sons on an hourly basis in the Fall of 2001, Cain told claimant that

> he had peak loads of work, he wanted me to work for him by the
> hour and get a regular paycheck and as we progressed and he
> weeded out different people in the company that he would put me

- 2 -

right on in there, and I figured with my age I would go ahead and finish my working history with Chuck Bennett.

On cross-examination, claimant admitted he had been working as a sheet metal worker for over twenty years. He admitted that he provided his own tools when he began hourly work for Bennett & Sons. Claimant denied ever paying Dennis for any work that he performed for Bennett & Sons. Claimant denied ever telling Cain or Chuck, Jr. that he considered himself to be self-employed. Claimant denied that he considered himself self-employed in November or December 2001. He denied ever telling Cain that he had his own insurance. He admitted that he never questioned why employer did not withhold taxes from his paycheck, because he "figured it's money in my pocket." Claimant admitted that when he went to the hospital in December 2001, he indicated that he was self-employed. Claimant explained that he "was trying not to jeopardize my job with Chuck Bennett & Sons. I felt like I've got maybe ten more years to work. I figured I'd work with him, finish up my work history with Chuck Bennett & Sons . . . ." Claimant believed that if he told the hospital personnel that he was working for Bennett & Sons, he might lose his job, because he did not know whether Bennett & Sons had insurance.

On redirect, claimant stated that it is common in his trade for employees to provide their own hand tools.

Cain testified that during November and December 2001, he was the only person who hired employees for Bennett & Sons. Cain admitted that he hired claimant in November 2001 and that claimant had worked on other jobs for Bennett & Sons before that time. Cain stated that when he hired claimant in November 2001, claimant told him he had his own insurance and that he was self-employed. Cain stated that claimant told him that he had his own truck and tools. Cain stated "we talked about payment arrangements, that we would continue as before but as [claimant] had testified the work had started pouring in on a continuous basis" and "[s]o now [we're] going to pay him by the hour." Cain stated that he did not withhold any taxes from

- 3 -

claimant's paychecks or match social security. Bennett & Sons sent claimant a 1099 form for wages he earned in 2001. Bennett & Sons did not provide any benefits to claimant, such as vacation, sick leave, or retirement. Cain denied ever hiring Dennis to work for Bennett & Sons or that anyone on behalf of Bennett & Sons did so. Cain admitted that Dennis performed work at Bennett & Sons' jobsites, but denied ever paying Dennis. Cain testified that claimant drove Dennis to the jobsites and that Dennis worked with claimant. Cain stated that claimant paid Dennis, claiming that he saw claimant hand money to Dennis on one occasion, after Cain had paid claimant.

On cross-examination, Cain admitted that claimant had worked for Bennett & Sons at the rate of $100 per day before the three-week period in 2001 when claimant worked for Bennett & Sons by the hour. Cain claimed that Dennis also worked on the company's jobsites during the three-week period when Bennett & Sons paid claimant by the hour. Cain admitted that he did not see claimant give any money to Dennis during the time he was being paid by the hour nor did Cain know whether any arrangement existed for Dennis to be paid during that period. Cain admitted that sometime around November 16, 2001, he and claimant agreed that claimant would work for employer on an hourly basis, five or more days per week. With respect to that conversation, Cain testified as follows:

> [W]e figured before an average workday was about nine to ten hours a day so Walter would be making prior to --- on the continuous basis of the free weeks, he would be making around ten dollars per hour. So I made an offer of nine dollars an hour and he said how about ten dollars an hour, this is as an employee with me taking taxes out. He said, I only bring home about $750 after that. He says, I can't do that, I can't work for that. And I said, well, I can't give you anymore unless you want to be an independent contractor and then you can withhold your own taxes and we --- and he said, how much, and I said eleven, and he said, okay, I'll do it.

Cain admitted that each morning he assigned workers to particular jobs that were obtained by Bennett & Sons according to the size of the job, what needed to be done, and the workers' skills. Cain admitted that either he or Chuck, Jr. were on the jobsites at least half of the time. Cain admitted that when he was on the jobsite, he directly supervised the persons performing the work. Cain "would make sure that the jobs were being done in accordance with what [he] was paying for." Cain admitted that although he did not need to stand over claimant and tell him how to do his work, Cain was the person in charge. Cain did not give claimant permission to subcontract his work while he was working on an hourly basis for Bennett & Sons. Cain admitted that it is common for sheet metal mechanics to furnish their own hand tools, whether they are employees or subcontractors.

Chuck, Jr., Cain's half-brother and part owner of Bennett & Sons, testified that the company's records showed that Bennett & Sons hired claimant to work on an hourly basis beginning November 16, 2001. Between November 16, 2001 and December 6, 2001, Chuck, Jr. worked with claimant, and was working with him on December 6, 2001 at the time of his accident. Chuck, Jr. was in charge of the jobsite that day. Chuck, Jr. testified that claimant's nephew, Dennis, worked with claimant when claimant worked for Bennett & Sons on a day-by-day basis, but not when claimant worked on an hourly basis. Chuck, Jr. denied that employer hired Dennis or paid him. Chuck, Jr. did not know how Dennis was paid.

In his *de bene esse* deposition, Dennis testified that he and claimant performed two weekend jobs in November 2000 for Bennett & Sons in response to Cain's offer of extra work. Dennis stated that Cain paid him and claimant, in cash, on both occasions, at the rate of $80 per person. Dennis contended that on one occasion Cain handed the money to him, and the other time, Cain gave the money to claimant. Dennis denied ever working for Bennett & Sons after November 2000. Dennis stated that claimant went to work for Bennett & Sons on a regular basis

in November 2001. Dennis testified that he gave claimant's telephone number to Cain after Cain inquired as to whether claimant would be interested in working for him full time. A few days later, claimant began working for Bennett & Sons, on a regular everyday basis, several weeks before his accident. Dennis denied ever working directly for claimant or ever being paid by claimant for doing work.

Based upon this record, the commission concluded that claimant was an employee of Bennett & Sons, rather than an independent contractor, at the time of his December 6, 2001 accident. We find no error in this conclusion.

"The Workers' Compensation Act covers employees but not independent contractors." County of Spotsylvania v. Walker, 25 Va. App. 224, 229, 487 S.E.2d 274, 276 (1997). This distinction must be determined from the facts of each case, with the burden upon the person seeking benefits under the Act to prove the relationship contemplated by the Act. Id. at 229-30, 487 S.E.2d at 276; see Code § 65.2-101. Although the commission's factual findings are binding and conclusive on appeal, when they are supported by credible evidence, see James v. Capitol Steel Constr. Co., 8 Va. App. 512, 515, 382 S.E.2d 487, 488 (1989), a "[d]etermination of the relationship involves a mixed question of law and fact which is reviewable on appeal," Walker, 25 Va. App. at 230, 487 S.E.2d at 276.

Generally, an individual "'is an employee if he works for wages or a salary and the person who hires him reserves the power to fire him and the power to exercise control over the work to be performed. The power of control is the most significant indicium of the employment relationship.'" Behrensen v. Whitaker, 10 Va. App. 364, 367, 392 S.E.2d 508, 509-10 (1990) (quoting Richmond Newspapers, Inc. v. Gill, 224 Va. 92, 98, 294 S.E.2d 840, 843 (1982)).

> [T]he right of control includes not only the power to specify the result to be attained, but the power to control "the means and methods by which the result is to be accomplished." An employer-employee relationship exists if the party for whom the

work is to be done has the power to direct the means and methods by which the other does the work. "[I]f the latter is free to adopt such means and methods as he chooses to accomplish the result, he is not an employee but an independent contractor." The extent of the reserved right of control may be determined by examining the performance of the parties in the activity under scrutiny.

Intermodal Servs., Inc. v. Smith, 234 Va. 596, 601, 364 S.E.2d 221, 224 (1988) (citations omitted).

The record contains credible evidence to support the commission's finding that Bennett & Sons maintained the requisite control over claimant to render him an employee. The undisputed evidence proved that in November 2001, Bennett & Sons hired claimant to work on a full-time, hourly basis, not by the job or day. Claimant reported to work around the same time every morning at a location designated by Cain, who then assigned claimant to a specific crew, which was assigned to a specific job for that day. Cain made those assignments after considering factors such as the size of the job, what needed to be done, and the relative skill level of the workers. Cain decided which combination of workers would be best for each job. Cain or Chuck, Jr. supervised the jobs by visiting the jobsites daily and, at times, staying on the jobsites. They were ultimately in charge of the jobsites to make sure the jobs were done correctly. Bennett & Sons did not permit claimant to hire subcontractors to perform his assigned work.

In its opinion, the commission acknowledged that no withholding taxes were taken out of claimant's paychecks, that he was issued a 1099 form, that Cain and claimant agreed to designate claimant an independent contractor, and that at the hospital, claimant described himself as self-employed. However, the commission correctly concluded that "labeling the claimant an 'independent contractor' or 'self-employed' pursuant to an agreement of the parties or for tax purposes is not controlling." Rather, the facts of each case must be examined to determine the status of a claimant at the time of his or her injury. See Walker, 25 Va. App. at 229-30, 487

S.E.2d at 276. The facts of this case established that claimant was Bennett & Sons' employee at the time of his compensable accident.

The commission also correctly noted that the fact that claimant was a skilled, experienced worker did not automatically render him an independent contractor. As we recognized in Purvis v. Porter Cabs, Inc., 38 Va. App. 760, 568 S.E.2d 424 (2002):

> The fundamental test of the employment relationship is the right of the employer to control the details of the employee's work. It is not the actual control exercised, but whether there exists the right and authority to control and direct the particular work or undertaking, as to the manner or means of its accomplishment.

> The test is based on the right to control, not the exercise. Most often the distinction is of importance when a skilled or experienced worker appears to be doing his or her job without supervision or interference. By an exercise test, the employee would seem to be uncontrolled; yet, it will often be found that the employer, in any showdown, would have the ultimate right to dictate the method of work if there were any occasion to do so. The right to control does not require the dictation of the thinking and manner of performing the work. It is enough if the employer has the right to direct the person by whom the services are to be performed, the time, place, degree and amount of said services.

Id. at 771-72, 568 S.E.2d at 429-30 (citations omitted).

Finally, the commission, as fact finder, resolved any inconsistencies in the witnesses' testimony in favor of claimant. It is well settled that credibility determinations are within the fact finder's exclusive purview. Goodyear Tire & Rubber Co. v. Pierce, 5 Va. App. 374, 381, 363 S.E.2d 433, 437 (1987).

For these reasons, we affirm the commission's decision.

Affirmed.