COURT OF APPEALS OF VIRGINIA

Present:   Judges Elder, McClanahan and Haley
Argued at Richmond, Virginia

CREATIVE DESIGNS TATTOOING ASSOCIATES, INC.

   v.      Record No. 1431-09-2

THE ESTATE OF EARLE LINDSEY PARRISH, III

                                                          OPINION BY
UNINSURED EMPLOYER'S FUND OF VIRGINIA          JUDGE JAMES W. HALEY, JR.
                                                          MAY 25, 2010

v.      Record No. 1925-09-2

THE ESTATE OF EARLE LINDSEY PARRISH, III AND
   CREATIVE DESIGNS TATTOOING ASSOCIATES, INC.


              FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION


              S. Vernon Priddy III (Mary Louise Kramer; Sands Anderson
              Marks & Miller, P.C., on briefs), for Creative Designs Tattooing
              Associates, Inc.

              Andrew R. Blair (Blair Law Offices, on brief), for Uninsured
              Employer's Fund of Virginia.

              Charlene A. Morring (Julie Roscoe Eckstein; Montagna Klein Camden,
              on brief), for The Estate of Earle Lindsey Parrish, III.


        In these consolidated cases, appellants, Creative Designs Tattooing Associates, Inc.

("Creative") and the Virginia Uninsured Employer's Fund ("Uninsured"), maintain the Workers'

Compensation Commission erred, *inter alia*, in determining that Earle Lindsey Parrish, III

("Parrish") was an employee of Creative, rather than an independent contractor.  We agree, and

conclude that Parrish was an independent contractor and, accordingly, his estate is not a

beneficiary of the Workers' Compensation Act.[1]

_____

        [1] Creative maintained the commission erred in assessing a fine against it for failing to
maintain workers' compensation insurance.  The commission found Creative had a *total* of three

That conclusion renders moot appellants' further claims that the commission erred in finding that Parrish's death arose out of his employment and that Creative had three or more employees regularly in service, accordingly authorizing a fine for failure to maintain workers' compensation insurance.

FACTS

Resolution of the dispositive issue necessitates a lengthy statement of the undisputed relevant facts.

For background purposes, we note that on May 27, 2005, one or more individuals entered Creative Designs, a tattoo parlor, where Parrish and one Mike Grogan were working as tattoo artists. Grogan was tattooing an individual in one room; Parrish was in the lobby. Grogan heard a "pop" which he did not recognize as a gunshot. A man with a gun entered the room and directed Grogan and his client to the basement, where he robbed both of them. Grogan advised he could not open a safe on the premises. Grogan did not hear any conversation one or more of the men had with Parrish. After the gunman left, Grogan discovered Parrish had been shot. Parrish died soon thereafter in a local hospital.[2]

Creative is a Virginia corporation owned by Janice L. Childress who operates a tattoo parlor in a building in Richmond. The parlor has space for two "chairs." These "chairs," or workstations, are located in closed rooms for privacy purposes. If a tattoo artist wished to work

---

employees, one of whom was Parrish, thereby triggering the necessity of maintaining workers' compensation insurance. See Code § 65.2-101(2)(h). An "employee" does not include "Employees of any [employer] that has regularly in service less than three employees . . . ." Id. Accordingly, with our conclusion Parrish was an independent contractor, not an employee, Creative had less than the threshold of three employees and was, thus, exempt from the provisions of the Workers' Compensation Act. As a result, the imposition of the fine was, likewise, error by the commission and that imposition is necessarily reversed.

[2] The facts surrounding Parrish's death will not be more fully developed, as they are relevant only as to whether his death arose out of his employment, an issue rendered moot, as noted above.

there, he or she would contact Childress and she would review the artist's "portfolio" of work. If Childress found the same acceptable and had an unoccupied chair, she would offer the artist an opportunity to work at the parlor. Apparently, in this field, artists shift from one parlor to another, as their circumstances, location, or desires dictate. Though Childress had the power to tell an artist a chair was "no longer available" for that artist, she had never done so prior to Parrish's death and any change in the artists who worked at Creative evolved because one would leave and seek another opportunity and another would contact Childress.

Childress and an artist negotiated a percentage of proceeds to be received by the artist and the parlor—usually 50% each.[3] Childress testified, "At the end of the night, [the artists] calculate the tattoos that they have done during the day and would fill that out on an envelope, take their percentage, put my percentage in the envelope and then deposit it in the safe." The safe was located on the premises and was "under [Childress'] control to take [her] money out of the safe." A combination number could open the safe, but there was no evidence that any artist had access to the same. The proceeds were almost always in cash, and the artists were free to take out their percentage upon receipt.

Childress had no written contracts with the artists. She provided no employee benefits, such as health insurance or retirement. She retained no sums for taxes, social security, or Medicare. She provided no records for the artists. She provided no W-2 or W-9 to the artists, and there is no evidence that any artist requested that she provide the same.

The artists set the hours they chose to work, that is, as the evidence showed, an earlier artist wanted to work from 11:00 a.m. to 7:00 p.m. Parrish had chosen to work from noon to 9:00 p.m. Each artist had a key to the premises, so as to accommodate his or her chosen work

---

[3] At the time of his death, Parrish was receiving 55% of proceeds.

schedule. The artists opened and closed the doors, turned off and on an alarm system, answered any phone calls, and set up any appointments resulting from those calls as they desired.

With respect to the artists' actual work, Childress did not mandate any number of hours of work per week, did not by herself determine when the parlor would or would not be open, did not direct how the work was to be done, did not direct what designs or colors were to be used for the tattoos, did not review the tattoo work, did not approve the artists' tools of the trade, did not meet with or receive phone calls from prospective clients, or schedule their appointments. Childress provided neither a receptionist nor janitor for the premises. The only time Childress became involved was, if there was a customer complaint, then she and the artist would meet with the customer to try to resolve the same (since she and the artist each had a financial interest in that resolution). That resolution could include a refund.

How was the price for a tattoo determined? Childress had no input whatsoever as to pricing. She determined no minimum or maximum price. The price of a tattoo was determined *solely* by negotiation between the client and the artist.

What are the tools of a tattoo artist's trade? Such an artist uses at a minimum two tattoo machines, one a liner and one a shader, though some used five or six machines for various purposes. Also used are a variety of inks, tubing for use between the inks and the machines, needles, a portfolio of available designs, Vaseline or similar ointments, bibs for the artist, gloves, and towels. Childress supplied none of these tools, and did not inspect them for adequacy. The artist brought *all* of the tools of the trade to the enterprise, and, as their owner, the artist was free to carry the tools away upon relocation. The only items Childress supplied were two release/ disclosure forms, one prepared by her attorney for Creative, and one mandated by the Virginia Board For Barbers and Cosmetology, to be executed prior to tattooing, and a "sharps container" for used needles. A "sharps container" is apparently a sealed hazardous waste trashcan.

Parrish and Mark Grogan were the two artists on the premises. Grogan had worked at Creative from 1995 to 2000, when he "left on his own" because "he wasn't getting along with one of the other artists." In 2005, he decided to return to Creative, as there was a "chair" available, and agreed to a 55% (for him)/45% proceeds division with Childress. His first day back at Creative was May 27, 2005, the day of Parrish's death.

Consistent with Childress' testimony, Grogan testified he "decided his schedule," and "told them when [he] wanted to work." He continued:

> Q. [W]ho makes the decision as to how much the customer is going to be charged for a specific tattoo?
>
> A. I do.
>
> Q. Okay. And is that negotiated with the customer?
>
> A. Yes, sir.
>
> Q. Okay. And if there's any negotiations on the charge, does the [sic] Jan Childress or Creative Design participate in that or is that between you and the customer?
>
> A. That's between me and the customer.
>
> Q. [T]he process that you do to apply the tattoo, is that solely your decision or is there input from Creative Designs?
>
> A. That's solely mine . . . . I do it the way I want to do it.

Grogan further testified that Creative Designs never withheld taxes or provided any benefits, like health insurance, sick leave or vacation time. Finally, he concluded: "To [his] knowledge . . . all his work arrangements were the same as were Parrish's."

## DECISION HISTORY

By opinion dated October 10, 2008, the deputy commissioner concluded Parrish was an employee. His reasoning consisted only of the following: Parrish

> had acquired managerial responsibilities over time, including opening and closing the shop and dealing with the alarm system

- 5 -

. . . [, and] the shop had scheduled work hours which, though negotiable, required an artist to be present at the shop during those hours. From this evidence we find the benefits of independence and control which characterize an independent contractor did not inure to the claimant.

A majority of the commission affirmed. With respect to the paramount issue of control, the commission noted that Childress "interviewed the artists before accepting them . . . [,] . . . had the authority to fire a tattoo artist[, and] set the work hours for advertising purposes . . . ."[4] The majority further noted that "the artists were paid a percentage . . . [and] instructed how to split the money and deposit the money in the safe." In addition, the majority wrote that Childress provided the sharps container, required the execution of the release forms,[5] and "dealt with customer complaints." However, as the commission further noted, "Childress testified that being a tattoo artist involved artistic skill, artistic talent, specific training and specific knowledge, none of which she herself possessed."

Commissioner Williams dissented. He noted Childress

did not exercise control over the decedent's work. The decedent made all the decisions regarding the means and methods by which he performed his work . . . . The decedent provided and maintained his equipment and supplies. The decedent chose his hours of work . . . . The decedent did not work for wages or a salary. Indeed, he and he alone determined the amount he would charge his customers . . . [and Childress did not provide] the decedent with any type of benefits or withhold taxes.

Finally, Commissioner Williams noted that the fact that "decedent had the authority to open and close the shop is equally indicative of his power of self-determination . . . ."

---

[4] We note that any advertising correlated to the work hours set by the artists, not by Childress.

[5] We further note it was the Commonwealth of Virginia that required the execution of one of the release forms.

## ANALYSIS

A claimant seeking benefits under the Workers' Compensation Act bears the burden of establishing that he is an employee as that term is defined in Code § 65.2-101. See Behrenson v. Whitaker, 10 Va. App. 364, 366, 392 S.E.2d 508, 509 (1990). An independent contractor is not an employee for Act purposes.

We view the evidence in the light most favorable to the parties prevailing before the commission. Westmoreland Coal v. Russell, 31 Va. App. 16, 20, 520 S.E.2d 839, 841 (1999). Nonetheless, "'[w]hat constitutes an employee is a question of law; but, whether the facts bring a person within the law's designation, is usually a question of fact.'" Intermodal Servs., Inc. v. Smith, 234 Va. 596, 600, 364 S.E.2d 221, 224 (1988) (quoting Baker v. Nussman, 152 Va. 293, 298, 147 S.E. 246, 249 (1929)). The determination as to whether an individual is an employee, or an independent contractor, accordingly, "involves a mixed question of law and fact which is reviewable on appeal." County of Spotsylvania v. Walker, 25 Va. App. 224, 230, 487 S.E.2d 274, 276 (1997). The conclusions of the commission as to mixed questions of law and fact are not binding on appellate courts. Peanut City Iron & Metal Co. v. Jenkins, 207 Va. 399, 403, 150 S.E.2d 120, 123 (1966).

"Whether the existing status is that of an employee or an independent contractor is governed, not by any express provision of the workmen's compensation law, but by common law." Hann v. Times-Dispatch Pub. Co, 166 Va. 102, 105, 184 S.E. 183, 184 (1936) (citing Crowder v. Haymaker, 164 Va. 77, 79, 178 S.E. 803, 804 (1935)). "No hard and fast rule can be laid down for ascertaining whether the status is one or the other. It must be determined from the facts of the particular case in the light of well settled principles." Id. at 105-06, 184 S.E. at 184 (quoted with approval in Brown v. Fox, 189 Va. 509, 516, 54 S.E.2d 109, 113 (1949)).

In Epperson v. DeJarnette, 164 Va. 482, 486, 180 S.E. 412, 416 (1935), the Virginia Supreme Court defined an "independent contractor" as:

> a person who is employed to do a piece of work without restriction as to the means to be employed, and who employs his own labor and undertakes to do the work according to his own ideas, or in accordance with plans furnished by the person for whom the work is done, to whom the owner looks only for results.

An independent contractor "'prosecutes and directs the work himself, using his own methods to accomplish it.'" Davis Bakery Co. v. Dozier, 139 Va. 628, 634, 124 S.E. 411, 412 (1924) (quoting Talley v. Drumheller, 135 Va. 186, 191, 115 S.E. 517, 519 (1923)). "The ordinary test is this: 'Who has the power to control and direct the servants in the performance of their work?'" Epperson, 164 Va. at 486, 180 S.E. at 414 (quoting Standard Oil Co. v. Anderson, 212 U.S. 215, 222 (1909)); see Virginia Emp. Comm'n v. A.I.M. Corp., 225 Va. 338, 347, 302 S.E.2d 534, 540 (1983) ("[I]f the latter is free to adopt such means and methods as he chooses to accomplish the result, he is not an employee but an independent contractor."); Ogunde v. Prison Health Servs., Inc., 274 Va. 55, 60-62, 645 S.E.2d 520, 524-25 (2007) (holding that medical services provider under contract with the Virginia Department of Corrections was an independent contractor where "the actual work to be performed . . . remain[ed] under the control of [the provider]" even though the contract set forth "staffing requirements" and restrictions on "overtime hours").

That inquiry has expanded to include an inquiry into other factors.

In Ross v. Schneider, 181 Va. 931, 27 S.E.2d 154 (1943), the Supreme Court noted "'the measure of compensation is also important for where it is based on time or piece the workman is usually a servant, and where it is based upon a lump sum for the task he is usually

a contractor.'" Id. at 940, 27 S.E.2d at 157-58 (quoting In re Murray, 154 A. 352, 354 (Me. 1931)); see also Glenmar Cinestate v. Farrell, 223 Va. 728, 734, 292 S.E.2d 366, 369 (1982).[6]

Whether there are deductions from compensation is, likewise, of relevance. Intermodal, 234 Va. at 602, 364 S.E.2d at 225 ("The plaintiff never was asked by the corporate defendant to complete any forms for payroll deductions. He was paid at a 'flat rate' for each trailer moved. No deductions were made from his compensation . . . ."); Hamilton Trucking v. Springer, 10 Va. App. 710, 716-17, 396 S.E.2d 379, 382 (1990) ("No social security was paid on his behalf . . . and none was deducted from his pay; no state or federal payroll taxes were withheld . . . .").

Another analytical factor is "whether the employer or the workman supplies the instrumentalities [and] tools . . . ." Uninsured Employer's Fund v. Clark, 26 Va. App. 277, 281, 494 S.E.2d 474, 476 (1998) ("[U]sing a truck and tools provided by [the statutory employer].");  see Mims v McCoy, 219 Va. 616, 617, 248 S.E.2d 817, 818 (1978) ("[T]hey would use their own tools . . . ."); 3 Arthur Larson & Lex K. Larson's Workers' Compensation Law § 60.01(2)(e).[7]

_____

[6] The "'payment of wages'" is an element of an employment relationship. Mount Vernon Builders, Inc. v. Rotty, 28 Va. App. 511, 514, 507 S.E.2d 95, 96 (1998) (quoting Behrensen, 10 Va. App. at 366, 392 S.E.2d at 509); Richmond Newspapers, Inc. v. Gill, 224 Va. 92, 98, 294 S.E.2d 840, 843 (1982) ("[A] person is an employee if he works for wages or a salary . . . ."); Crowder, 164 Va. at 81, 178 S.E. at 805 ("[T]he fact that payment may be made by the piece, job, day or hour, is not necessarily controlling. It is but a fact to be considered."); 3 Arthur Larson & Lex K. Larson's Workers' Compensation Law § 61.06 ("[P]ayment on a time basis is strong indication of the status of employment. Payment on a completed project basis is indicative of independent contractor status.").

[7] Baker, 152 Va. at 295, 147 S.E. at 246 ("He was . . . to furnish all the teams and tools . . . ."); Craddock Moving & Storage Co. v. Settles, 16 Va. App. 1, 4, 427 S.E.2d 428, 430 (1993) ("Craddock owned the truck and supplied all of the tools Settles . . . used."), aff'd, 247 Va. 165, 440 S.E.2d 613 (1994); Metropolitan Cleaning Corp. v. Crawley, 14 Va. App. 261, 265, 416 S.E.2d 35, 38 (1992) ("She was not required to furnish her own tools or supplies."); Brothers Construction Co. v. V.E.C., 26 Va. App. 286, 296, 494 S.E.2d 478, 483 (1998) ("While the installers provided their own tools and transportation, Brothers provided all of the materials for

An additional analytical factor is how hours of work are determined. See Mims, 219 Va. at 617, 248 S.E.2d at 818 ("they would choose their own work hours . . ."); Walker, 25 Va. App. at 232, 487 S.E.2d at 278 ("While the claimant was paid by the hour, she controlled the actual number of hours she worked."). Although these additional factors have relevance, "[t]he power of control is the most significant indicium of the employment relationship; other factors merely help to elucidate the manner and degree of control." Richmond Newspapers Inc. v. Gill, 224 Va. 92, 98, 294 S.E.2d 840, 843 (1982) (quoted with approval in Dillon Constr. v. Carter, 55 Va. App. 426, 431, 686 S.E.2d 542, 544 (2009)); see also Intermodal, 234 Va. at 601, 364 S.E.2d at 224.

Accordingly, we address the above noted factors to the paramount issue of control. Parrish *alone* prosecuted and directed the work and used only his chosen methods to accomplish it. Parrish *alone* provided the instrumentalities, supplies, and tools for his work. Parrish *alone* reached agreement as to what tattoo or tattoos would be inscribed. Parrish *alone* chose his hours of work. Parrish was not paid wages or salary, had no deductions taken from his compensation, and was paid in a lump sum for his work. Finally, and of decisive import, Parrish *alone* set the price for his work. See 3 Larson, supra, § 61.06(2), note 30 ("*A fortiori*, payment in the form of a percentage of gross revenue is a strong indication of contractorship.").

The dissent maintains that Parrish was "promoted" in that his percentage of gross receipts had risen to 55% at the time of his death. Yet Grogan, on his first day of work, was likewise receiving 55%. The dissent maintains that Parrish's "promotion" was a recognition

---

completion of the job. The installers were not free to choose their own materials or purchase materials from other sources.").

- 10 -

that he had "managerial duties," a factor likewise noted by the commission. The only evidence touching on the subject of management (by Parrish) was the testimony of decedent's fiancée, who simply stated, without any foundation or explanation, that "decedent was promoted to manager and increased his percentage rate." Childress, on the other hand, explained in the context of a "change" in decedent's "duties," that the "other artist quit, he would be the only one there. So, obviously . . . his duties . . . change." By that statement, she meant the decedent would be the only one to answer the phone, "[h]e would be the only one to help customers," and would of necessity be required to open and close the shop. We do not consider these activities to be "managerial duties." And we do not agree they can be dispositive of whether Parrish was an employee or an independent contractor. Likewise, footnote 1 of the dissent states: "[n]o evidence established that Parrish . . . did not have the combination [to the safe]." No evidence established that he did. Indeed, the only evidence on the subject was that the safe was "[u]nder Childress's control," that Grogan did not have the combination, and that, as Grogan testified, "[a]ll his work arrangements were the same as Parrish's." Thus, the only reasonable inference from the evidence was that Parrish, likewise, could not open the safe.

Finally, the dissent relies upon <u>Purvis v. Porter Cabs, Inc.</u>, 38 Va. App. 760, 568 S.E.2d 424 (2002), in support of its position. We find that reliance substantially misplaced in light of the following quotations from <u>Purvis</u>: (1) "All cabs were painted with the Porter name and *the rate schedule provided by Porter*." <u>Id.</u> at 764, 568 S.E.2d at 426 (emphasis added); (2) "Porter also provides *a list of rules* the drivers must follow . . . . These rules address, *inter alia*, *length of breaks, cab maintenance, and the drivers' relationship* with the dispatcher." <u>Id.</u> (emphasis added); (3) "'The drivers had to accept all fares unless the driver felt he or she was in danger. A driver *could not pick up a fare without Porter's permission*.'" <u>Id.</u> at 769, 568 S.E.2d at 428 (quoting from the record) (emphasis added); (4) "'The way that works is you have to ask

permission to (sic) the dispatcher. *Once you ask the dispatcher, it is up to her to say yes or no. If she says no, then you cannot pick it up.'*" Id. (quoting from the record) (emphasis added).

Childress did not provide the rate; Parrish did. Childress had no list of rules involving breaks, or even hours of Parrish's work; Parrish chose them. Childress had no rules involving maintenance (or provision) of Parrish's tools; Childress did not require Parrish to accept, or seek permission to decline, any individual seeking a tattoo.

The factual contrast, as to control, between Purvis and the instant case is stark, and demonstrates why the dissent's reliance on Purvis is misplaced.

CONCLUSION

For these reasons, then, we hold Parrish was an independent contractor, not an employee of Creative Designs. Accordingly, the decision of the commission is reversed and the cause remanded to the commission for implementation of our decision.

Reversed and remanded.

Elder, J., dissenting.

The majority holds that Parrish was not an employee of Creative Designs Tattooing Associates, Inc. (Creative Designs or employer), at the time of his death and, thus, his estate (claimant) is not entitled to death benefits under the Workers' Compensation Act (the Act). I believe the evidence supports the commission's finding that the tattoo artists working for Creative Designs—Parrish and Mark Grogan—were covered employees, making Creative Designs subject to the relevant provisions of the Act. I further agree with the commission's finding that the assault resulting in Parrish's death arose out of his employment with Creative Designs. I would, therefore, affirm the commission's award of death benefits to claimant and its assessment of a civil penalty against employer for failing to maintain workers' compensation insurance. Accordingly, I respectfully dissent.

I.

The majority addresses only one assignment of error, whereas I would address and reject all four of Creative Designs' arguments on appeal. It is also my belief that the majority, contrary to well-settled principles, does not view the evidence in the light most favorable to the claimant, the party prevailing below. See Westmoreland Coal v. Russell, 31 Va. App. 16, 20, 520 S.E.2d 839, 841 (1999). Accordingly, I provide a recitation of the facts separate from the majority's.

At the time of Parrish's injury and death in 2005, Janice Childress had owned and operated the Creative Designs tattoo parlor for approximately two years, since 2003. Childress oversaw her parlor's day-to-day operations, performing tasks such as paying bills, hiring tattoo artists, and maintaining the business' reputation. Childress did not design or apply tattoos.

Mark Grogan, one of Creative Designs' tattoo artists, testified that on May 27, 2005, an unknown assailant robbed the tattoo parlor. As Grogan was working on a tattoo with a client, he heard a "loud pop" and saw an unidentified man walk into the room brandishing a firearm. The

assailant took money from Grogan and the client and ordered them down into the basement. The assailant also demanded Grogan open the safe, but Grogan claimed he did not have access to it. Prior to the assailant's entering the main room, Grogan had heard people talking in the lobby where Parrish was located. As Grogan entered the basement, he heard Parrish moan. Parrish later died from a gunshot wound. A certified copy of Parrish's death record indicated Parrish was "on the job as a tattoo artist when he was shot by an assailant in an attempted robbery."

Childress testified about her methods for staffing her business. She explained that due to the small communal nature of the tattoo industry, artists would hear of a vacancy at Creative Designs and ask to be "placed in a chair." Childress would view the applicant's portfolio, and "if their ability [met her] standards," she "would offer them a space." Childress would then negotiate what percentage of the client fee the artist would receive. The typical arrangement was that the artist and Creative Designs would each receive 50%. At the end of each night, the artist would calculate the number of tattoos he had completed during the day and write the total on an envelope, take his percentage, put Childress' percentage in the envelop, and deposit it in a safe located in the back room of the parlor.[8]

Childress required all tattoo artists at her parlor to be licensed. She also required her artists to complete liability release forms to be signed by each client. The purpose of the form was to shield Creative Designs from liability in case a client had an allergic reaction to the pigments or dyes. The form referred to the tattoo artists as "representatives and employees."

---

[8] The evidence, viewed in the light most favorable to claimant, does not support the majority's assertion that "no artist had access to the [safe]." Grogan, who had just returned to work at Creative Designs on the day of the shooting, after working elsewhere for the previous five years, testified that he did not know the combination to the safe. Childress also testified that once the tattoo artists put money in the safe, "it was then under her control to take [her] money out of the safe." However, no evidence established that Parrish, who had worked there for a longer period of time than Grogan and had responsibilities for opening and closing the parlor, did not have the combination.

Childress testified that she did not spend much time at Creative Designs. In the case of a complaint, she directed the client to attempt to resolve the complaint with the tattoo artist who performed the work. If the issue could not be resolved, the artist would call Childress, who would refund the client's money in its entirety if necessary. Childress stated that for purposes of advertising, she maintained consistent hours that were affixed on the door. Lorraine Baltz, Parrish's fiancée at the time of his death, testified Parrish "had to get clearance from Ms. Childress first" before taking time off. In her own words, Childress had to be "advised" of the change in hours. Indeed, it was Childress who dictated when the parlor opened on the day of Parrish's death.

Because tattoo artistry requires "specific training [and] knowledge," Childress did not maintain control over the style, quality, and time of each individual artist. Each artist also had full discretion to negotiate the price of each tattoo with the individual client. However, Childress retained the ability to terminate an artist if necessary and, contrary to the majority's claim, had done so on one occasion.

Parrish began working at Creative Designs as an unpaid apprentice under another tattoo artist. Eventually, Parrish was deemed ready to work as a paid artist and began receiving compensation. At first, Parrish earned 35% of the fee he received from each client. At the time of his death, Parrish was keeping 55% of the fee. Parrish was also given more responsibilities, including answering the phone and opening and closing the parlor.

II.

A.

PARRISH WAS A COVERED EMPLOYEE

The commission held that the evidence as a whole indicated Parrish was a covered employee and not an independent contractor. Central to the commission's reasoning was the fact

that Parrish acquired managerial duties as he continued his employment with Childress and that the percentage of his fee increased. I believe the majority both improperly fails to mention this crucial fact in its analysis and further ignores the evidence that Childress retained a significant power of control over the tattoo artists under her employ considering the specific nature of the tattoo industry.

Under the common law, the four criteria we must consider are the "'(1) [s]election and engagement of the servant; (2) payment of wages; (3) power of dismissal; and (4) the power of control of the servant's action.'" Crowder v. Haymaker, 164 Va. 77, 79, 178 S.E. 803, 804 (1935) (quoting Baker v. Nussman, 152 Va. 293, 303, 147 S.E. 246, 249 (1929)). "The power of control is the most significant indicium of the employment relationship; other factors merely help to elucidate the manner and degree of control." Richmond Newspapers, Inc. v. Gill, 224 Va. 92, 98, 294 S.E.2d 840, 843 (1982).

> [T]he right of control includes not only the power to specify the result to be attained, but also the power to control "the means and methods by which the result is to be accomplished." Gill, 224 Va. at 98, 294 S.E.2d at 843. An employer/employee relationship exists if the party for whom the work is to be done has the power to direct the means and methods by which the other does the work. "If the latter is free to adopt such means and methods as he chooses to accomplish the result, he is not an employee but an independent contractor." [Va. Emp. Comm'n v.] A.I.M. Corp., 225 Va. [338,] 347, 302 S.E.2d [534,] 540 [(1983)]. The extent of the reserved right of control may be determined by examining the performance of the parties in the activity under scrutiny.

Intermodal Servs., Inc. v. Smith, 234 Va. 596, 601, 364 S.E.2d 221, 224 (1988).

We look to the "potential power of control, not the actual exercise of control." A.I.M. Corp., 225 Va. at 347, 302 S.E.2d at 539-40. Accordingly, we should "look to the nature of the work to determine on a case-by-case basis whether the employer possessed the requisite degree of control for the claimant to qualify as an employee." Dillon Constr. v. Carter, 55 Va. App. 426, 431, 686 S.E.2d 542, 544 (2009). As is the case here, we must acknowledge that in some

industries, the employer necessarily abdicates a portion of her control without bypassing the protections and benefits afforded by the Act. See Purvis v. Porter Cabs, Inc., 38 Va. App. 760, 772, 568 S.E.2d 424, 429 (2002) (noting that the "right of control" "is of importance when a skilled or experienced worker appears to be doing his or her job without supervision or interferences"). We cannot deny benefits to highly skilled and specialized employees in these industries without first examining how much potential control remains within the employer's power.

In Purvis, we reversed the commission and remanded for an award of compensation because the evidence established that the decedent was an employee of the employer-appellee. 38 Va. App. at 773, 568 S.E.2d at 430. In that case, the decedent operated a taxicab owned by Neil Fairley, who received dispatches from Porter Cabs. No written agreement existed among the decedent, Fairley, or Porter. The evidence further proved

> Porter interviewed and determined which potential drivers received a rate card that allowed the drivers to drive; Porter had specific rules the drivers had to follow while driving for Porter; Porter could suspend a driver temporarily or fire him or her; and Porter controlled the drivers' business by directing what fares were dispatched to each driver, preventing the drivers from picking up fares off the street without permission and not allowing drivers to refuse fares unless there were safety issues.

Id. at 771, 568 S.E.2d at 429. We found this evidence established "the requisite exercise over the 'selection and engagement' of the driver, the 'power to dismiss' the driver and, most importantly, the 'power of control' over the driver's actions." Id. (quoting Behrensen v. Whitaker, 10 Va. App. 364, 366, 392 S.E.2d 508, 509 (1990)).

The majority fails to take into consideration the facts similar to those found in Purvis that support the commission's ruling that Childress possessed the potential power of control over Parrish's work. While the evidence clearly shows Childress did not dictate how the artists were to perform their jobs in designing and applying tattoos, she still set standards for their practice

and artistry. Childress required applicants to show examples of their past work so that Childress could develop a sense of the artist's style. The artists were further subject to Childress' control because she required them to be licensed. Childress retained the ability to oversee the quality of the artists' work by firing them, and she had done so on one occasion. She also had the final word in resolving customer complaints in that she determined whether an artist would be required to refund a dissatisfied client's money. Finally, Childress required her artists to fill out liability release forms. The language of the form referred to the tattoo artists as "representatives and employees," which I find to be further evidence supporting the commission's determination that Parrish was a covered employee. See Dillon Constr., 55 Va. App. at 433, 686 S.E.2d at 545 (recognizing that while not dispositive of the question of whether a person is a covered employee, "the parties' intent can be considered as a factor in the ultimate determination").

Most significantly, the majority's analysis ignores the crucial fact that Parrish was "promoted" from an unpaid apprentice to an employee with managerial duties. Notably, it was Childress who made the business decision to promote him. When Parrish first became a full-time tattoo artist, he received only 35% of the fee paid by each client, but he soon became entitled to keep 55% of the proceeds as his responsibilities within the company increased, 5% more than the typical fee for a tattoo artist. The fact Childress paid Parrish 5% more and did not hire a receptionist or janitor further evinces her reliance on Parrish to perform the regular duties of an employee to maintain the business. The majority relies on Childress' testimony that Parrish attained these responsibilities solely by virtue of his being the only artist at the parlor and views this testimony in the light favorable to Creative Designs. This is plainly in error, as we do "not retry the facts, reweigh the preponderance of the evidence, or make [our] own determination of the *credibility of the witnesses*." Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991) (emphasis added). The commission had the opportunity to hear Childress'

- 18 -

self-serving testimony, and it is clear the commission rejected her explanation for Parrish's increased managerial duties. See Westmoreland Coal Co., 31 Va. App. at 20, 520 S.E.2d at 841 ("The commission's factual findings are conclusive and binding on this Court when those findings are based on credible evidence.").

The facts the majority views as dispositive in the resolution of this case do not include the critical element of control. While Parrish relied upon his own expertise and skill to work with a client in creating a tattoo, Childress had the ultimate say regarding the quality of the product because she hired each artist and could fire him if she found his work unsatisfactory. Indeed, Childress testified that her business reputation hinged on the quality of her artists' work. While Parrish provided the majority of his own tools, this fact is not dispositive. See Dillon Constr., 55 Va. App. at 432, 686 S.E.2d at 545 (noting that both the claimant and the employer provided tools and materials when working at job sites). Parrish could not arbitrarily set his work hours; Childress had to be consulted first in order to maintain consistent hours for advertising purposes. Childress placed restrictions on her tattoo artists' work by requiring them to obtain their clients' signatures on liability release forms and creating protocols for disposing of used needles. Even though Parrish was not paid set wages, the percentage of the fee he received increased based on the length of time he worked at Creative Designs and the additional managerial responsibilities he assumed. Further, while Childress did not retain sums for taxes or social security, it is not error for the commission to conclude, in light of the totality of the evidence, that this fact was not dispositive. See id. at 433, 686 S.E.2d at 545. In short, I do not believe the evidence relied upon by the majority is sufficient to warrant reversing the commission's decision.

B.

CREATIVE DESIGNS EMPLOYED THREE OR MORE PERSONS

At the time of Parrish's death, Childress was Creative Designs' officer, and Parrish and Grogan also worked for the company. The commission recognized that "the work of the tattoo artists did not require constant supervision and direction by the employer." Nonetheless, it found that Childress had "the requisite amount of control over the tattoo artists" for them to be considered employees. I believe this determination was correct.

An employer is not liable "to pay worker's compensation under the Act" if it employs "[fewer] than three employees 'regularly in service' in the Commonwealth." Mark Five Constr. v. Castle Contr., 274 Va. 283, 288, 645 S.E.2d 475, 477 (2007) (quoting Code § 65.2-101(2)(h)). The term "employee" includes "every person . . . in the service of another under any contract of hire or apprenticeship, written or implied, except whose employment is not in the usual course of the trade, business, occupation or profession of the employer." Code § 65.2-101(1)(a); see Cotman v. Green, 4 Va. App. 256, 258, 356 S.E.2d 447, 448 (1987) (holding part-time workers are included in the definition of "employee"). The employer has the burden of proving that she regularly employed fewer than three employees in Virginia. See Craddock Moving & Storage Co. v. Settles, 16 Va. App. 1, 2, 427 S.E.2d 428, 429 (1993), aff'd, 247 Va. 165, 440 S.E.2d 613 (1994).

"The determination of whether an employer has met its burden of proving that it regularly employs fewer than three employees 'is made by the Commission after exercising its role as finder of fact.'" Perry v. Delisle, 46 Va. App. 57, 66, 615 S.E.2d 494, 496 (2005) (quoting Bass v. City of Richmond Police Dep't, 258 Va. 103, 114, 515 S.E.2d 557, 563 (1999)). Accordingly, we give this determination great deference on appeal if there is credible evidence in the record to support it. See id. The analysis used to determine whether an employer has three or more

employees is the same as the test for determining whether the claimant is a covered employee or independent contractor. Therefore, we must consider anew those same principles to determine whether Grogan qualified as an employee or an independent contractor. See Osborne v. Forner, 36 Va. App. 91, 95, 548 S.E.2d 270, 272 (2001). Under this analytical framework, I would hold Creative Designs failed to meet its burden of proving he was not an employee.

While the record does not disclose whether Grogan shared in the same managerial responsibilities as Parrish, it is clear he shared the same arrangement in all other respects. Thus, my belief that Parrish was a covered employee of Creative applies with equal force to Grogan's status as a covered employee. Accordingly, Creative Designs employed three persons—Parrish, Childress, and Grogan—and is therefore liable to pay workers' compensation under the Act.

C.

PARRISH'S DEATH AROSE OUT OF HIS EMPLOYMENT

"[F]or an injury to be compensable, the claimant must show that the injury was the result of an 'accident,' that it 'arose out of' the employment and that it occurred 'in the course of' the employment." Baggett Transp. Co. v. Dillon, 219 Va. 633, 636, 248 S.E.2d 819, 821 (1978). "The statutory language 'arising out of and in the course of the employment' should be liberally construed to carry out the humane and beneficial purposes of the Act." Id. at 637, 248 S.E.2d at 822.

"An accident arises out of the employment if there is a causal connection between the claimant's injury and the conditions under which the employer requires the work to be performed." R&T Investments, Ltd. v. Johns, 228 Va. 249, 252, 321 S.E.2d 287, 289 (1984). Absent contrary or conflicting evidence, "if an employee is found dead at or near his place of work from an unexplained accident, the accident will be presumed to have arisen out of and in the course of employment." Metcalf v. A. M. Express Moving Sys., Inc., 230 Va. 464, 468, 339

- 21 -

S.E.2d 177, 180 (1986).  Moreover, a "physical assault may constitute an 'accident' within the meaning of the Act when it appears that it was the result of an actual risk arising out of the employment and not personal to the employee."  Reamer v. Nat'l Serv. Indus., Inc., 237 Va. 466, 470, 377 S.E.2d 627, 629 (1989).

I would hold the commission properly applied the presumption in this case to find "the clear motive for the shooting was robbery."  On the day of the shooting, during normal business hours, Grogan heard a loud pop and then soon after heard Parrish moan.  Grogan did not hear any conversation in the lobby, nor did he see anyone enter Creative Designs.  In fact, Grogan was unable to give any specific details of the events immediately preceding the shooting that could contradict this presumption.  In light of this lack of additional information concerning why Parrish was shot, I believe the evidence compels the conclusion that Parrish's death arose out of and in the course of his employment.

Next, I would hold the record contains no evidence refuting the presumption.  It is clear that "the only rational inference to be drawn is that [Parrish's] death arose out of and in the course of his employment."  Baggett, 219 Va. at 642, 248 S.E.2d at 824.  No evidence indicates that the assault was personal in nature.  Grogan did not hear a tirade of a personal nature between Parrish and the assailant, nor did the evidence establish Parrish had any enemies.  The assailant's actions after shooting Parrish support rather than refute the presumption.  The assailant entered the room where Grogan and his client sat and demanded both access to the safe and to their personal money, as well.  This evinces the assailant's motive to rob the store.  It is therefore reasonable to infer that the assailant made a similar demand to Parrish, who resisted and was shot.  See Hopson v. Hungerford Coal Co., 187 Va. 299, 307, 46 S.E.2d 392, 396 (1948) ("[I]f the death occurred while [the employee] was attempting to protect his employer's property from theft, his death might have been said to have arisen out of his employment.").  Thus, in this case,

I would hold the evidence supports the commission's finding that Parrish's death arose out of and in the course of his employment.

D.

CIVIL PENALTY AGAINST CREATIVE DESIGNS

Code § 65.2-805 authorizes the commission to assess a civil penalty against an employer for failing to provide workers' compensation insurance. See generally Va. Used Auto Parts, Inc. v. Robertson, 212 Va. 100, 181 S.E.2d 612 (1971). Because Creative Designs employed three or more persons and failed to maintain adequate insurance coverage, I would hold the commission did not err in assessing a $1,000 penalty against Creative Designs.

III.

We must recognize that "[t]he Act is to be liberally construed to effect its beneficent purpose and in borderline cases 'employment' should be found to exist." A.I.M. Corp., 225 Va. at 346, 302 S.E.2d at 539 (quoting Unemp. Comp. Comm'n v. Collins, 182 Va. 426, 438, 29 S.E.2d 388, 393 (1944)). To apply too stringent a standard to an industry requiring highly skilled and specialized laborers would cause us to stray from this laudable purpose. Here, the evidence supports the finding that Childress possessed the requisite degree of control over the tattoo artists working in her parlor. For these reasons, I would hold the commission did not err in finding Parrish was a covered employee under the Act, and I would affirm its award of death benefits to claimant. Thus, I respectfully dissent.